# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 21, 2021          Decided February 22, 2022

No. 20-5280

NATIONAL ASSOCIATION OF POSTAL SUPERVISORS,
APPELLANT

v.

UNITED STATES POSTAL SERVICE AND UNITED POSTMASTERS
AND MANAGERS OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02236)

*Abigail A. Graber* argued the cause for appellant. With her on the briefs were *Jean M. Zachariasiewicz* and *Andrew D. Freeman*.

*Sean Janda*, Attorney, U.S. Department of Justice, argued the cause for United States Postal Service. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, *Mark B. Stern*, Attorney, and *Morgan E. Rehrig* and *Michelle A. Windmueller*, Attorneys, U.S. Postal Service.

*Jonathan Greenbaum* was on the brief for appellee United Postmasters and Managers of America in support of appellees.

Before: PILLARD and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The Postal Reorganization Act of 1970 ("Act" or "Postal Act") delegates authority to the United States Postal Service ("Postal Service" or "USPS") to, *inter alia*, "classify and fix the compensation and benefits of all officers and employees." 39 U.S.C. § 1003(a). In setting compensation, the Act requires the Postal Service to "provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades . . . and supervisory and other managerial personnel." *Id.* § 1004(a). In addition, the Postal Service must "achieve and maintain compensation for its . . . employees comparable to the rates and types of compensation paid in the private sector of the economy." *Id.* § 101(c); *see also id.* § 1003(a). The Act also directs the Postal Service to allow organizations representing supervisory and other managerial employees "to participate directly in the planning and development of pay policies and schedules, fringe benefit programs, and other programs relating to supervisory and other managerial employees." *Id*. § 1004(b).

The principal dispute in this case concerns the Postal Service's proposed 2016–2019 pay package for its "Field" Executive and Administrative Schedule ("EAS") personnel ("Field Pay Package"). The National Association of Postal Supervisors ("Association"), a recognized organization of supervisory personnel, filed a complaint in the District Court challenging the Postal Service's adoption of the Field Pay Package. The Association alleged that the Postal Service violated the Postal Act by failing to provide a pay differential between clerks and carriers and the supervisors that manage

them, and also failing to consider private sector compensation and benefits. The Association also challenged the Postal Service's refusal to consult with the Association regarding pay policies for Association members who are postmasters or whom the Postal Service categorizes as "Headquarters" and "Area" employees.

In response to the Association's complaint, the Postal Service argued that the matters in dispute regarding the Field Pay Package are not subject to judicial review. The Postal Service maintained that provisions in the Act authorizing the adoption of pay packages merely state "policy goals" that the agency "should attempt to achieve," not mandatory and enforceable directives. Br. for Appellee 4, 30. The District Court agreed and granted the Postal Service's motion to dismiss the Association's complaint for failure to state a claim. *Nat'l Ass'n of Postal Supervisors v. USPS*, No. 1:19-CV-2236, 2020 WL 4039177, at *3-7 (D.D.C. July 17, 2020), *reprinted in* Joint Appendix ("J.A.") 39-52. The Association then filed a timely appeal claiming that the District Court erred in dismissing its complaint. We agree.

It is well established that judicial review of Postal Service actions "is available . . . to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its statutory authority.'" *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (quoting *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)) (citations omitted). In *National Association of Postal Supervisors v. USPS*, 602 F.2d 420, 435, 439, 440 (D.C. Cir. 1979) ("*National Association*"), we held that the statutory provisions at issue in this case are mandatory directives enforceable pursuant to *ultra vires* review. The scope of review articulated in *National Association* plainly controls the disposition of this case.

After carefully reviewing the record in this case, and applying controlling principles from *National Association* and its progeny, we hold that the Association has plausibly alleged that the Postal Service exceeded its statutory authority and failed to act in conformance with the commands of the Act in the following respects: First, the Postal Service acted *ultra vires* by failing to institute "*some* differential" in pay for supervisors and by failing to demonstrate that it "set its compensation levels by reference, *inter alia*, to the compensation paid" in the private sector. *Id.* at 435, 440; *see also* 39 U.S.C. §§ 101(c), 1003(a), 1004(a). Second, the Postal Service failed to follow the commands of the Act by refusing to consult with the Association on compensation for "Area" and "Headquarters" employees; by refusing to consult regarding postmasters; and by failing to provide the Association with reasons for rejecting its recommendations. *See* 39 U.S.C. § 1004(b); *National Association*, 602 F.2d at 439. Accordingly, we reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Legal Framework

Congress established the Postal Service as an independent agency under the Executive Branch in the Postal Reorganization Act of 1970, Pub. L. No. 91-375, 84 Stat. 719. *See also* 39 U.S.C. § 201. As noted above, the Act instructs the Postal Service to classify and fix the compensation and benefits of all officers and employees; provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades and supervisory and other managerial personnel; and to achieve and maintain compensation for its employees

comparable to the rates and types of compensation paid in the private sector of the economy. *See id.* §§ 101(c), 1003(a), 1004(a), (b).

Under the Postal Act, the salaries of rank-and-file employees – like clerks and carriers – are determined through a process of collective bargaining with recognized labor unions. *Id.* §§ 1202–1209. Collective bargaining for rank-and-file employees is covered by the National Labor Relations Act and subject to the jurisdiction of the National Labor Relations Board. *Id.* § 1209(a). By contrast, supervisory and managerial personnel are expressly excluded from representation in any collective bargaining unit. *Id.* § 1202(1).

Instead, the Act directs the Postal Service to "provide a program for consultation with recognized organizations of supervisory and other managerial personnel who are not subject to collective-bargaining agreements under chapter 12 of this title." *Id.* § 1004(b). An organization is "recognized" under the Act if it is "a supervisory organization [that] represents a majority of supervisors," "an organization (other than an organization representing supervisors) [that] represents at least 20 percent of postmasters," or "a managerial organization (other than an organization representing supervisors or postmasters) [that] represents a substantial percentage of managerial employees." *Id.*

Once recognized, an organization is "entitled to participate directly in the planning and development of pay policies and schedules . . . relating to supervisory and other managerial employees." *Id.* The Act requires the Postal Service to meet "at least once a month" with any recognized organization, share details of proposed compensation programs, and allow the organizations time to make recommendations in response. *Id.* § 1004(c)–(d). The Postal Service must give recommendations

made by recognized organizations "full and fair consideration," and, "if any of such recommendations are rejected," must provide reasons to the organization explaining why. *Id.* § 1004(d)(1)(C), (2)(C).

In the event that a recognized organization "believes that the decision of the Postal Service is not in accordance with the provisions of [the Postal Act]," the statute includes a dispute resolution process. *Id.* § 1004(f)(1). Upon request by a recognized organization, the Federal Mediation and Conciliation Service must convene a factfinding panel to review the Postal Service's decision. *Id.* The panel hears from the parties and makes recommendations concerning supervisory pay programs. *Id.* § 1004(f)(3), (4). The Postal Service must then "give full and fair consideration to the panel's recommendation and shall explain in writing any differences between its final decision and the panel's recommendation." *Id.* § 1004(f)(5).

## B. Factual Background

The Postal Service employs approximately 625,000 workers, about 49,000 of whom are supervisors, managers, postmasters, and other professional and administrative workers. These workers, known as "Executive and Administrative Schedule" employees, operate under the direction of approximately 500 executives, and in turn manage hundreds of thousands of rank-and-file employees, like clerks and carriers. The Postal Service designates its EAS employees as either "Headquarters," "Area," or "Field" employees, based on "where employees work or to whom they report." Reply Br. for Appellant 19. EAS employees are distributed across more than 1,000 job titles and levels.

The National Association of Postal Supervisors is a "recognized organization[] of supervisory and other managerial personnel" employed by the Postal Service. 39 U.S.C. § 1004(b). It has approximately 27,000 members comprising active and retired Postal Service managers, supervisors, postmasters, and other professionals. Association members include employees whom the Postal Service categorizes as "Field," "Area," and "Headquarters" employees, as well as postmasters.

*1. Field Employees*

In September 2017, the Postal Service sent a proposed pay package to the Association for its "Field" EAS employees for fiscal years 2016 to 2019 ("Field Pay Package"). In the months following, the Postal Service consulted with the Association on the package via meetings, letters, and emails. The Postal Service rejected most of the Association's recommendations and issued a final decision in summer 2018. It did not provide any reasons for rejecting the Association's recommendations.

The Association requested that the Federal Mediation and Conciliation Service convene a factfinding panel to review the Field Pay Package. It contended the Field Pay Package violated the Act's requirements for setting adequate and reasonable pay differentials between supervisory and rank-and-file employees, *id.* § 1004(a), and for maintaining compensation and benefits comparable to those in the private sector, *id.* §§ 101(c), 1003(a).

The Association alleged the five percent "Supervisory Differential Adjustment" included in the package resulted in thousands of supervisors earning less than persons who they supervised because the Postal Service used a lower paid clerk position as the benchmark for this differential instead of a

higher paid (and more populous) carrier position. In addition, the Association claimed that many clerks and carriers received more total compensation than supervisors because they earned overtime at higher rates and after fewer hours than their supervisors, and they also received larger and more regular pay increases.

Regarding comparability, the Association alleged that the Postal Service took no steps to compare compensation or benefits to the private sector before issuing the initial Field Pay Package. Only after the factfinding panel was convened did the Postal Service hire a consultant to evaluate pay (but not benefits or other compensation) for eight out of 1,000 positions. The Association further alleged that the Postal Service did not consider high-wage locations or provide locality pay, refused to offer bonuses, and did not adjust pay in line with inflation or market increases as is done in the private sector.

The factfinding panel held a two-day hearing in December 2018 and issued its unanimous findings in a report in April 2019. It found that the Supervisory Differential Adjustment method used by the Postal Service had, in many instances, resulted in unreasonable and inadequate pay differentials. Regarding comparability, the panel concluded that the Postal Service had violated the Act's comparability requirement by issuing a final decision on the Field Pay Package without conducting any market survey into private compensation. It further concluded that the Postal Service method for determining pay increases, "as constructed and implemented by the [Postal] Service, does not satisfy the statutory criteri[on] of comparability." Compl. ¶ 26, J.A. 11.

The factfinding panel made recommendations for bringing compensation for supervisors into conformance with the Act.

*See id.* ¶ 68, J.A. 20. Approximately two weeks after the factfinding report was issued, the Postal Service rejected most of the recommendations and issued a final decision adhering to the differential and comparability conclusions in the original Field Pay Package.

### 2. Area and Headquarters Employees

The Association has 7,500 members in the "Area" and "Headquarters" categories. It claims that these members include "employees who perform supervisory and managerial responsibilities associated with a range of functions" such as those in "vehicle maintenance, shared services, financial, sales, and marketing." Compl. ¶ 57, J.A. 18. On December 18, 2018, without having engaged in any consultation with the Association, the Postal Service issued a separate and "final" pay package for Area and Headquarters EAS employees through fiscal year 2019 ("Area and Headquarters Pay Package").

The package listed a small number of Headquarters and Area positions that the Postal Service does recognize as represented by the Association, but stated that the package "will not apply to those Headquarters and Area positions who are represented by the [Association]." *Id.* ¶ 62, J.A. 18-19. No pay package has been issued, nor has any consultation with the Association been undertaken, for those few Headquarters and Area employees the Postal Service recognizes as properly represented by the Association for the time period at issue.

### 3. Postmaster Employees

Finally, during this same period, the Association attempted to represent its postmaster members in negotiations regarding compensation. The Association has 4,100 postmaster

members. This is the second largest postmaster membership group in the country after the United Postmasters and Managers of America ("United Postmasters"), a recognized organization that also represents postmasters. The Postal Service rejected the Association's request for recognition, saying that it "cannot lawfully recognize [the Association] as a representative of postmasters in addition to supervisors." Compl. ¶ 79, J.A. 23. The Postal Service has steadfastly refused to consult with the Association on compensation for postmasters.

### 4. Procedural History

On July 26, 2019, the Association filed a complaint in the District Court. The complaint alleges that the Postal Service has violated section 1004(b) of the Postal Act by refusing to recognize or consult with the Association regarding postmasters and supervisors or other managerial personnel categorized as Area or Headquarters employees. It further claims that the Postal Service has violated the Act by failing to maintain any differential between many supervisors and the employees they oversee, and by failing to achieve and maintain compensation comparable to the private sector. Finally, it claims that the Postal Service failed to meet its obligation to "provide compensation . . . that will assure the attraction and retention of qualified and capable supervisory and other managerial personnel." 39 U.S.C. § 1004(a). In response to the complaint, the Postal Service filed a motion to dismiss for failure to state a claim. United Postmasters intervened in support of the Postal Service's position that the Association cannot lawfully represent postmasters and filed its own motion to dismiss.

The District Court granted the motions to dismiss, finding that the Association failed to state a claim because it had not

shown that the Postal Service had violated a "clear and mandatory" statutory directive. *See Nat'l Ass'n of Postal Supervisors*, 2020 WL 4039177, at \*7, J.A. 50. The Association now appeals.

The Association raised no challenge in this appeal to the District Court's dismissal of Count III of its complaint, related to the Postal Service's obligation to ensure compensation that will attract and retain qualified supervisory personnel. *See* Compl. ¶¶ 93-99, J.A. 24-25; 39 U.S.C. § 1004(a). We therefore uphold the dismissal of Count III, any further challenge to which has been forfeited by the Association.

## II. ANALYSIS

### A. Standard of Review

This court reviews *de novo* a District Court's grant of a motion to dismiss for failure to state a claim. *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021). We must "assume the truth of the plaintiff's well-pleaded factual allegations in the complaint" and "draw[] all reasonable inferences in plaintiff's favor." *Statewide Bonding, Inc. v. U.S. Dep't of Homeland Sec.*, 980 F.3d 109, 114 (D.C. Cir. 2020); *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 788 (D.C. Cir. 2019).

### B. Availability of Judicial Review

The actions of the Postal Service are expressly "exempt from review under the Administrative Procedure Act" ("APA"). *N. Air Cargo v. USPS*, 674 F.3d 852, 858 (D.C. Cir. 2012); *see also* 39 U.S.C § 410(a) ("[T]he provisions of chapter[] . . . 7 of title 5 [the APA], shall [not] apply to the exercise of the powers of the Postal Service."). However, "the

case law in this circuit is clear that judicial review is available when an agency acts *ultra vires*," or outside of the authority Congress granted. *Aid Ass'n for Lutherans*, 321 F.3d at 1173. Review for *ultra vires* acts rests on the longstanding principle that if an agency action is "unauthorized by the statute under which [the agency] assumes to act," the agency has "violate[d] the law" and "the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996).

In line with this precedent, we have repeatedly held that Postal Service "actions are reviewable to determine whether it has acted in excess of its statutory authority." *N. Air Cargo*, 674 F.3d at 858; *see also National Association*, 602 F.2d at 432; *Aid Ass'n for Lutherans*, 321 F.3d at 1173; *Sears, Roebuck & Co. v. USPS*, 844 F.3d 260, 265 (D.C. Cir. 2016). While a court "can defer to the exercise of administrative discretion on internal management matters, . . . [we] cannot abdicate [our] responsibility to insure compliance with congressional directives setting the limits on that discretion." *National Association*, 602 F.2d at 432. In evaluating decisions by the Postal Service, "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority." *Id.* Similarly, "[a]n agency construction of a statute cannot survive judicial review if [it] reflects an action that exceeds the agency's authority." *Aid Ass'n for Lutherans*, 321 F.3d at 1174.

The Postal Service does not contest that *ultra vires* review of its decisions is available. Br. for Appellee 17, 27. Rather, it argues that the narrow scope of non-APA review precludes the Association's claims in this case because the statutory provisions at issue are not "clear and mandatory" limitations on the Postal Service's authority enforceable through *ultra*

*vires* review. *Id.* at 24-25 (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)), 30-31. The Postal Service contends that because the statutory language states that "[i]t shall be the *policy* of the Postal Service" to provide pay differentials and comparable compensation, Congress intended these provisions to be "simply [some] of many (often conflicting) 'policy' goals noted in the statute." 39 U.S.C. §§ 1003(a), 1004(a) (emphasis added); Br. for Appellee 18, 30-31. The Postal Service suggests that Congress's use of the word "policy" indicates that these provisions are merely "advisory goals" that cannot be enforced. Br. for Appellee 31. We disagree because the Postal Service's position is directly at odds with our precedent.

Many years ago, in our decision in *National Association*, we made it absolutely clear that the pay differential, comparability requirements, and requirement to consult in the Postal Act place clear limits on the agency's authority and are subject to non-APA review. 602 F.2d at 432, 435, 439, 440. *National Association* remains good law and controls in this case. *See Aid Ass'n for Lutherans*, 321 F.3d at 1173-74 (reaffirming central holdings in *National Association*).

The statutory provisions at issue in this case contain explicit language stating what the Postal Service "shall" do. 39 U.S.C. §§ 101(c), 1003(a), 1004(a), 1004(b). That language is undoubtably mandatory. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) ("'shall' is 'mandatory' and 'normally creates an obligation impervious to judicial discretion'" (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998))). Congress's inclusion of a factfinding panel tasked with reviewing Postal Service compensation policies to ensure they are "consistent with the policies of this title, including sections 1003(a) and 1004(a)" is further evidence that Congress intended its stated

directives to be observed by the Postal Service. 39 U.S.C. § 1004(f)(3)(A).

Congress's use of the word "policy" in a statute does not presumptively make a directive voluntary. Rather, while Congress may choose to commit certain policy decisions to an agency's discretion, *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865-66 (1984), here Congress *expressly removed* certain policy choices from the Postal Service by directing that "[i]t shall be the policy" of the agency to ensure a differential and comparability, *see* 39 U.S.C. §§ 1003(a), 1004(a). Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion for the agency to do otherwise.

Finally, as noted above, the Postal Service's characterization of what constitutes a "clear and mandatory" statutory provision that is reviewable for *ultra vires* acts is patently at odds with our governing precedent. The Postal Service is correct that a challenged action must "contravene[] a clear and specific statutory mandate" to be susceptible to *ultra vires* review. *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1264 (D.C. Cir. 2006). In *Leedom v. Kyne*, the seminal case affirming the availability of *ultra vires* review, the Court held that a "clear and mandatory" statutory provision is judicially enforceable. 358 U.S. at 188. And the case law following *Leedom* confirms that the "clear and mandatory" standard subsumes review of claims involving "positive statutory commands," *Nat'l Air Traffic Controllers Ass'n AFL-CIO*, 437 F.3d at 1263, questions of statutory interpretation, *Aid Ass'n for Lutherans*, 321 F.3d at 1173, and questions regarding whether an agency decision was supported by a contemporaneous justification, *N. Air Cargo*, 674 F.3d at 859-60; *see also Sears, Roebuck & Co.*, 844 F.3d at 265 (describing claims subject to non-APA

review). So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms. *See Chamber of Com.*, 74 F.3d at 1327-28.

In contrast, we have held that vague statutory provisions, such as one that requires an agency to use "appropriate data" to calculate a payment amount, are not sufficiently clear and mandatory to warrant non-APA review. *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509-10 (D.C. Cir. 2019); *see also Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (holding that a statutory provision requiring an agency to hire "suitably qualified" U.S. citizens was not subject to *ultra vires* review). Unlike the statutory requirements in this case, those ambiguous provisions lack discernible standards by which a court can identify a limit to agency authority.

The Postal Service also argues that judicial review of Postal Service compensation decisions should be foreclosed because Congress included a provision for factfinding in the Act. In other words, the Postal Service suggests that the factfinding dispute resolution process supplants the need for judicial review. Br. for Appellee 27-29; *see* § 1004(f)–(g). The conclusion urged by the Postal Service does not follow from its starting premise. "The history of the Postal Act indicates that Congress contemplated a very restricted judicial role in the Postal Service's compensation decisions" but "[i]t does not present the kind of evidence necessary to foreclose review altogether." *National Association*, 602 F.2d at 432; *see also Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) ("only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review" (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967))). Congress's addition of

the dispute resolution process in 1980, which it discussed as a means to reduce litigation but not supplant judicial review, does not alter that conclusion. *See* S. Rep. No. 96-856, at 4 (1980) ("It is the committee's intention to develop a dispute procedure which will make it more likely the parties can resolve their differences through improved consultation, rather than through the courts.").

In sum, the Postal Act's requirements that the Postal Service "shall" consult with recognized organizations, maintain "adequate and reasonable differentials in rates of pay" between supervisors and clerks and carriers, and "achieve and maintain compensation for its officers and employees comparable to the rates and types of compensation paid in the private sector" are clear and mandatory, enforceable provisions subject to review for *ultra vires* acts. 39 U.S.C. §§ 101(c), 1003(a), 1004(a), (b).

## C. Pay Differential Requirement per § 1004(a) and Comparability Requirement per §§ 101(c), 1003(a)

We turn now to the Association's claim that the Postal Service violated the Act by failing to maintain a supervisory pay differential or conduct a comparability analysis with respect to the Field Pay Package. In considering the issues in this case, we remain mindful that "[r]eviewability and the scope of review are two separate questions." *National Association*, 602 F.2d at 432. "[T]he Postal Service has broad discretion in setting compensation levels," but this "does not mean . . . that its decisions are entirely insulated from judicial surveillance." *Id.* As we have already explained, "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority." *Id.*

*1. The Postal Service Acted* Ultra Vires *by Failing to Maintain "Some" Pay Differential*

The Postal Act requires that the Postal Service "provide adequate and reasonable differentials in rates of pay between employees in the clerk and carrier grades in the line work force and supervisory and other managerial personnel." 39 U.S.C. § 1004(a). The Postal Service contends that it has satisfied the pay differential requirement in section 1004(a) through its Supervisory Differential Adjustment, which sets a five percent differential between supervisors' pay and the pay of clerks and carriers. Br. for Appellee 32-33. However, the Association argues that the method used to implement the differential is flawed and, as a result, "thousands of EAS employees earn[] less than the craft workers they supervise." Compl. ¶ 37, J.A. 13.

As we determined in *National Association*, "[t]he Postal Act does require *some* differential, and requires that that differential be adequate and reasonable." 602 F.2d at 435. "[T]he differential guarantee" is not "a meaningless, empty promise, one which the Postal Service can ignore at will." *Id.* Though a differential must be present, the Postal Service has broad discretion to decide its size and how it is computed. *Id.* at 433 ("Congress chose . . . to leave the precise differential to the discretion of the agency."). Accordingly, "a court can compel the Postal Service to *consider* and *fulfill* the differential requirement, but it cannot substitute its own judgment of what is adequate and reasonable for that of the Postal Service." *Id.* at 435 (emphases added).

In alleging the Postal Service provided *no* differential in pay for thousands of supervisory employees, the Association thus states a claim that the Postal Service has exceeded its statutory authority. It is the responsibility of the Postal Service

to indicate that it has established "*some* differential." *Id.* Here, such a showing has not been made.

*2. The Postal Service Acted* Ultra Vires *by Failing to Consider Private Sector Pay and Achieve Comparability*

Section 101(c) directs that, "[a]s an employer, the Postal Service shall achieve and maintain compensation for its officers and employees comparable to the rates and types of compensation paid in the private sector of the economy." 39 U.S.C. § 101(c). Again, in section 1003(a) Congress instructed that "[i]t *shall* be the policy of the Postal Service to maintain compensation and benefits for *all* officers and employees on a standard of comparability to the compensation and benefits paid for comparable levels of work in the private sector of the economy." *Id.* § 1003(a) (emphases added).

Appellant alleges the Postal Service did not study private compensation or benefits before issuing its Field Pay Package. Only after the final package was issued and the factfinding panel was convened did the Postal Service inquire into private pay rates. Even then, it only looked at pay rates for eight out of a thousand positions included in the Field Pay Package. It did not study total *compensation or benefits*, as specified in the Act, for any positions. Compl. ¶ 23, J.A. 10. The result is compensation the Association alleges is not "comparable" to the private sector. The Postal Service counters that it met its statutory requirements with the pay study of eight positions in addition to its "internal expertise." Br. for Appellee 33-34.

In *National Association*, we determined that the Act's "provisions require that the Postal Service set its compensation levels by reference, *inter alia*, to the compensation paid" in the private sector. 602 F.2d at 440. We described the comparable pay provision as one of several "requirements" and said that

the Postal Service must, at minimum, "consider[] all the factors as directed by the Postal Act," *id.* at 440-41, and "arrive[] at a good faith judgment," *id.* at 435. Thus, to meet its statutory obligation, the Postal Service must (1) consider private sector compensation and benefit rates in setting compensation for "all" employees, and (2) show a good faith determination that compensation and benefits are comparable. In order to set compensation "by reference . . . to" private compensation and benefit rates, *id.* at 440, the Postal Service must know what those rates are. In addition, the statute's directive that the Postal Service "maintain" comparable compensation entails some showing that it is keeping pace with rising private sector rates.

Within these bounds, the Postal Service has broad discretion to "achieve and maintain" comparability to the private sector using the means it sees fit. *See id.* at 432 (recognizing that the Postal Service "must have the freedom . . . to control costs" in an efficient manner). The statute does not specify how similar the rates must be, the manner in which rates are compared, or the method of study of private sector rates. However, the Postal Service cannot choose to ignore private sector compensation rates altogether, and it must demonstrate in good faith that it has "achieve[d] and maintain[ed]" comparability in line with Congress's directives. 39 U.S.C. § 101(c).

Here, the Postal Service has not shown that it considered private sector compensation and benefits nor explained how it has achieved comparability in its rates. It has not provided a justification for its conclusion that comparability has been achieved, nor explained its resolution of factors built into the comparability requirement like locality pay and market rate increases in pay. Absent a reasoned explanation showing otherwise, the Postal Service's belated and limited look at pay – and not total compensation or benefits – for only eight of

1,000 positions plainly fails to meet its statutory obligation to achieve comparability in good faith "for all officers and employees." *Id.* § 1003(a).

## D. Requirement to Consult per § 1004(b)

Finally, we consider the Association's claim that the Postal Service acted *ultra vires* by refusing to consult with the Association about pay policies relating to Association members who (1) are categorized as "Area" or "Headquarters" employees or (2) are postmasters. "Section 1004(b) provides that representatives of supervisory and other managerial personnel [who are not subject to collective-bargaining agreements under the Act] are entitled to participate directly in the development of Postal Service compensation programs and policies." *National Association*, 602 F.2d at 436; 39 U.S.C. § 1004(b). In *National Association*, we found that, to meet this requirement, "the Postal Service must discuss its proposed compensation policies with the Association[] before those policies go into effect, and . . . that such discussions must be conducted in a meaningful, good faith manner." 602 F.2d at 436. Ultimately, "if the Postal Service gives the Association[] an opportunity to analyze and criticize proposed compensation decisions and the materials on which those decisions are based, and then supplies the Association[] with reasons for rejecting any criticisms in advance of a final decision, then the Postal Service has met its statutory obligations under section 1004(b) and the judicial function is at an end." *Id.* at 439. It follows that refusal by the Postal Service to consult at all on compensation for eligible employees constitutes a violation of the mandatory consultation provision.

The Postal Service has refused to consult with the Association regarding compensation for most workers it deems "Area" or "Headquarters" employees, as opposed to Field

employees. Additionally, it has refused to consult with the Association about postmasters' compensation. The Association contends the statute entitles it to represent these employees in pay policy negotiations and, accordingly, that the Postal Service has acted outside the scope of its authority by refusing to do so. Finally, it claims that the Postal Service failed to provide it with reasons for rejecting its recommendations.

*1. The Postal Service Acted* Ultra Vires *by Refusing to Consult Regarding Area and Headquarters Employees Without Providing Any Explanation*

The Postal Service recognizes the Association as an organization representing Field EAS employees, but not most Area and Headquarters employees. The reasoning provided by the Postal Service for this position is sparse and self-serving. The Postal Service simply asserts, with no evidence to support its claim, that Area and Headquarters employees are not "supervisory" or "other managerial employees" under the Act. Br. for Appellee 10, 43-44; *see* 39 U.S.C. § 1004(b). According to the Postal Service, these employees are "professional, technical, administrative[,] and clerical employees" and, therefore, not entitled to representation. Br. for Appellee 10. No further explanation has been provided as to how the Postal Service reached this conclusion or why certain EAS employees qualify for representation and others do not. Compl. ¶ 63, J.A. 19. As a result, most Area and Headquarters EAS employees have been denied representation by the Association in the pay policy process.

The Association argues that the term "supervisory and other managerial employees," as used in the Act, is synonymous with EAS employees. Corrected Br. for Appellant 41. It points out that the Area and Headquarters employees in question are neither executives nor members of collective

bargaining units, but rather an in-between group that undertakes the supervisory and managerial functions of assuring that the policies set by the executives are carried out by the craft employees. *Id.* The designations "Field," "Headquarters," and "Area," it notes, have been created by the agency and do not appear in the Act. *Id.* at 43. The Association thus alleges that the Postal Service has acted outside the scope of its authority by refusing to consult on pay policy for Area and Headquarters employees.

Under *ultra vires* review, a statutory construction by an agency is "impermissible" if it is "utterly unreasonable." *Aid Ass'n for Lutherans*, 321 F.3d at 1174. "We 'owe a measure of deference to the agency's own construction of its organic statute, but the ultimate responsibility for determining the bounds of administrative discretion is judicial.'" *Id.* at 1173 (quoting *National Association*, 602 F.2d at 432-33). Moreover, an agency acts *ultra vires* when its decision is not supported by "a contemporaneous justification by the agency itself," but only a "*post hoc* explanation [by] counsel." *N. Air Cargo*, 674 F.3d at 860 (citing *SEC v. Chenery*, 318 U.S. 80 (1943)).

Here, we cannot assess whether the Postal Service's claim regarding "supervisory and other managerial employees" is plausible because the Postal Service has failed to offer any support for its position. "When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). In this case, we do not know the criteria by which employees were categorized as "professional, technical, administrative, [or] clerical employees," nor how their job functions differ from those the Postal Service deems "supervisory and other managerial employees." We have no insight into the Postal Service's classification of any particular role. Moreover, the thin

reasoning the Postal Service has supplied was provided for the first time in this litigation by counsel. Corrected Br. for Appellant 47-50.

What is clear is that the Postal Service may not arbitrarily exclude employees from representation they are entitled to under the Act. *See Leedom*, 358 U.S. at 189 (finding an agency action *ultra vires* that "deprived . . . employees of a 'right' assured to them by Congress"). The Postal Act plainly obligates the agency to consult with respect to compensation for supervisory and other managerial employees regardless of their designation by the Postal Service as "Field," "Headquarters," or "Area" employees. Moreover, section 1004(b) indicates that employees are either entitled to representation by a union for the purposes of collective bargaining under chapter 12 of the Act, or permitted representation by a "program for consultation with recognized organizations of supervisory and other managerial personnel." 39 U.S.C. § 1004(b).

We reject the Postal Service's position that it may deny employees the representation rights granted by Congress by simply declaring employees not to be supervisory or other managerial personnel. It draws on a definitional provision in the statute to argue that "members of the supervisors' organization" are *limited to* employees "who are recognized under an agreement between the Postal Service and the supervisors' organization as represented by such organization." Br. for Appellee 41 (quoting 39 U.S.C. § 1004(i)(2)). The Postal Service proffers that if it does not agree to recognize employees as "members," then those employees are not entitled to representation under the Act. *Id.* This is a specious argument.

Indeed, the Association represented at oral argument that no such "agreement between the Postal Service and the supervisors' organization" has been in effect since 1981. The Postal Service did not dispute this claim. If the Postal Service's position regarding enforcement of the requirement to consult were accepted, then all Association members would be without consultation rights. Obviously, this would be an untenable situation. Therefore, to support its claim that certain Area and Headquarters employees do not qualify for representation by the Association, the Postal Service must demonstrate that the job functions of these employees are not supervisory or "other managerial" in nature. 39 U.S.C. § 1004(b).

The Postal Service further claims that the Association has not plausibly alleged a violation of section 1004(b) because "it has not even attempted to allege facts demonstrating that it represents any discrete set of EAS employees covered by the [Area and Headquarters] Pay Package." Br. for Appellee 44. This claim is belied by the record. The Association has alleged that it represents 7,500 employees throughout the country whom the Postal Service categorizes as "Headquarters" or "Area" employees, and claimed that such employees perform supervisory and managerial responsibilities. Compl. ¶ 57, J.A. 18. It has also contended that the Postal Service "failed entirely to consult" with the Association regarding compensation policies for *all* Headquarters and Area employees, and that the Postal Service refuses to recognize its representation of many of these employees. *Id.* ¶¶ 59-63, J.A. 18-19.

For those few Area and Headquarters employees the Postal Service recognizes as represented by the Association, the Postal Service has exceeded its authority by failing to consult. At oral argument, the Postal Service attempted to argue that because it expressly excluded those employees from the general Area and Headquarters Pay Package and did not issue

any 2016 to 2019 pay package for these employees, it did not breach its obligation to consult. *See also id.* ¶¶ 61-62, J.A. 18-19. This reeks of chicanery. The Postal Service may not evade its statutory obligation to consult by excluding employees from its pay packages and refusing to promulgate any pay policies for them. *See* 39 U.S.C. § 1004(e)(1) (requiring the Postal Service to propose a pay package for members of a supervisory organization within forty-five days of reaching a collective bargaining agreement for rank-and-file employees).

As things now stand, it appears that the Postal Service is of the view that the majority of Area and Headquarters employees are not entitled to representation by the Association because they are not "supervisory" or "other managerial employees." *Id.* § 1004(b). However, the Postal Service's position reflects nothing more than an unsupported assertion that is strongly contested by the Association. On remand, the District Court must determine which of these employees have been improperly excluded from the right to representation granted in section 1004(b).

*2. The Postal Service's Refusal to Consult with the Association Regarding Postmasters is* Ultra Vires

Section 1004(b) sets the requirements for a group to become a "recognized organization[]" that is "entitled to participate directly" in the planning and development of compensation policy for its members. 39 U.S.C. § 1004(b). In order to become a recognized organization, a group must prove that it is *either* (1) a supervisory organization that represents a majority of supervisors; (2) an organization (other than an organization representing supervisors) that represents at least twenty percent of postmasters; *or* (3) a managerial organization (other than an organization representing supervisors or postmasters) that represents a substantial percentage of

managerial employees. *Id.* Once an organization has satisfied any one of these three standards, "such organization . . . shall be entitled to participate directly" in the development of compensation policies "relating to supervisory and other managerial employees." *Id.*

The Postal Service contends this provision mandates that separate, mutually exclusive organizations represent *only* supervisory employees *or* postmasters *or* managerial employees. Br. for Appellee 38-40. Because the Association represents supervisory employees, the Postal Service insists, it cannot also represent postmasters. The Postal Service relies on this construction to justify its refusal to consult with the Association regarding its 4,100 postmaster members. Because there is currently no freestanding organization to represent managerial employees, who are instead represented by the Association and recognized organizations of postmasters, this interpretation would deny all managerial employees representation in the development of pay policies. Corrected Br. for Appellant 47; Reply Br. for Appellant 4. Intervenor United Postmasters has endorsed the Postal Service's position. *See* Br. for Intervenor Def.-Appellee 8.

Once again, the question before us is whether "the disputed [agency interpretation] defies the plain language of a statute or . . . the agency's construction is utterly unreasonable and thus impermissible." *Aid Ass'n for Lutherans*, 321 F.3d at 1174. As we explain below, the Postal Service's construction requires adding text to the Act that Congress pointedly omitted. We therefore hold that the Postal Service's position is contrary to the plain language of the Act.

The carefully worded language of section 1004(b) presents different requirements for supervisory organizations than it does for postmaster or managerial organizations. In requiring

that a supervisory organization represent "a majority of supervisors," Congress made clear that there can be only *one* such organization authorized to consult on behalf of supervisors. 39 U.S.C. § 1004(b). Multiple organizations cannot each represent "a majority of supervisors," only one can. However, because any given postmasters' organization must only represent "at least 20 percent of postmasters," as many as five postmasters' organizations could qualify under the Act. Likewise, a managerial organization must only represent "a substantial percentage of managerial employees," so many managerial organizations could qualify. *Id.* This distinction sets the supervisory organization apart from the start.

While postmasters' organizations are expressly prohibited from also representing supervisors, and managerial organizations are prohibited from also representing supervisors or postmasters, no such restriction is placed on supervisory organizations. Supervisory organizations – beyond having to show they represent a majority of supervisors – are not limited in who else they can represent. This precisely crafted statute thus presents a "nested" structure, in which Congress placed deliberate restrictions on postmasters' organizations (which may not represent supervisors) and on managerial organizations (which may not represent either supervisors or postmasters), but conspicuously left the supervisory organization free to represent either postmasters or managers alongside supervisors. *See* Figure 1, *infra*. "[W]hen Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)). The Act does not say that a supervisory organization cannot represent postmasters. Therefore, the Postal Service's

construction of the statute would require us to write a restriction into the text that is not there. We will not do that. *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010) ("We do not—we cannot—add provisions to a federal statute.").



*Figure 1: Section 1004(b)'s Nested Structure*

This precise enactment of statutory language on the part of Congress was no accident. First, it reflects the history of the Act and the representative organizations that were in existence when the Act was first passed. When the consultation process was established in 1970, the Association represented "a majority of supervisors" and was thus the sole recognized supervisory organization. *See National Association*, 602 F.2d at 438 (discussing early consultation agreements between the Association and Postal Service). The original statute made no reference to postmasters or postmaster organizations, but permitted "managerial organization[s] (other than an organization representing supervisors) [that] represent[] a substantial percentage of managerial employees." Pub. L. No. 91-375, 84 Stat. 719, 731 (1970). At that time, organizations

representing postmasters qualified for consultation as "managerial organization[s]." *See National Association*, 602 F.2d at 426 n.7 (describing the National Association of Postmasters of the United States and the National League of Postmasters of the United States as recognized organizations under § 1004(b) before the statute mentioned postmasters' organizations). Postmasters were thus understood to be a subset of "supervisory and other managerial" employees. No standalone organization for managerial employees existed at the Act's inception, nor does one exist today. Corrected Br. for Appellant 47; Reply Br. for Appellant 4.

In 1980, Congress added to the Act the detailed participation process and factfinding panel for resolving disputes now codified in 39 U.S.C. § 1004(c)–(g). Pub. L. No. 96-326, 94 Stat. 1023 (1980). However, as originally enacted, these provisions permitted *only the supervisory organization* to engage in these processes. *Id.* "Managerial organizations," then consisting of organizations representing postmasters, could consult but were excluded from protection of the participation requirements and dispute resolution process. S. Rep. No. 108-112, at 3 (2003). This "left postmasters with no avenue to resolve disagreements with Postal Headquarters" and "limited their ability to have meaningful discussions with Postal Headquarters on issues relating to pay and benefits." *Id.*

In 2003, Congress amended the Postal Act to allow postmasters' organizations access to the same participation and dispute resolution procedures available to supervisory organizations. *See* Postmasters' Equity Act of 2003, Pub. L. No. 108-86, 117 Stat. 1052. It defined "postmasters' organization" in the Act, added the twenty percent threshold for recognition, and afforded postmasters' groups access to the dispute resolution process. *Id.* at 1052-53. Congress left in

place the catchall category of "managerial organization," even though no such separate group existed.

Rather than institute a rigid separation, the 2003 amendment confirms that postmasters are managers: "'postmaster' means an individual who is the manager in charge of the operations of a post office, with or without the assistance of subordinate managers or supervisors." 39 U.S.C. § 1004(i)(3). Notably, when Congress amended the Act in 2003, it did not add a restriction that would prevent postmasters who were already members of the Association from continuing membership in that larger umbrella group. Rather, Congress took care to preserve these employees' access to membership in the general supervisory organization, while ensuring that postmasters' organizations could additionally avail themselves of the dispute resolution measures.

Importantly, Congress safeguarded the ability of managerial personnel – who had no organization of their own – to seek representation via either an existing recognized supervisory organization or postmasters' organization. The resulting structure gives Postal Service managers and postmasters the choice to throw in their lot with the general supervisory organization, which represents the interests of all supervisory and managerial employees including postmasters, or, if they prefer, to join their own, category-specific negotiating body.

It is noteworthy that the Postal Service's position that it "cannot lawfully recognize [the Association] as a representative of postmasters in addition to supervisors," Compl. ¶ 79, J.A. 23, is belied by its own practice. At oral argument, counsel for the Postal Service acknowledged that the agency has consulted with the Association (and Intervenor United Postmasters and Managers of America) on

compensation policies for *managerial* employees and continues to do so today. The parenthetical restrictions in the statute cannot both be read to permit these organizations to represent managerial employees but to deny supervisory organizations the ability to represent postmasters. The Postal Service's proposed interpretation that these groups must be mutually exclusive presents an "utterly unreasonable" interpretation of the statute that contravenes Congress's careful wording and would deny thousands of managerial employees access to the protections of the Act as Congress intended. *Aid Ass'n for Lutherans*, 321 F.3d at 1174.

In sum, it is undisputed that the Association qualifies as a recognized organization under the Postal Act because it represents "a majority of supervisors." 39 U.S.C. § 1004(b); Br. for Appellee 7-8. Having met this threshold requirement, it is therefore "entitled to participate directly in the planning and development of pay policies . . . relating to supervisory and other managerial employees." 39 U.S.C. § 1004(b). Its postmaster members, described in the Act as "manager[s] . . . with or without the assistance of subordinate managers or supervisors," *id.* § 1004(i)(3), plainly fall into the broad category of "supervisory and other managerial employees" the Association may represent, *id.* § 1004(b). It follows that section 1004(b) requires the Postal Service to consult with the Association regarding compensation for these employees.

*3. The Postal Service Must Give Reasons for Rejecting the Association's Recommendations*

Finally, the Association alleges the Postal Service did not supply reasons for rejecting its recommendations on the Field Pay Package before issuing a final decision. Compl. ¶¶ 53-54, J.A. 17. The plain text of section 1004(b) and our precedent mandate that the Postal Service must "suppl[y] the

Association[] with reasons for rejecting any criticisms in advance of a final decision." *National Association*, 602 F.2d at 439. The Postal Service exceeded the scope of its statutory authority by issuing the Field Pay Package without first explaining why it was rejecting the Association's recommendations.

## III. CONCLUSION

For the reasons set forth above, we hold that the Association plausibly alleges that the Postal Service exceeded the scope of its delegated authority on multiple counts. Accordingly, the judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.