# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 5, 2021        Decided July 8, 2022

No. 20-5337

FEDERAL EXPRESS CORPORATION,
APPELLANT

v.

UNITED STATES DEPARTMENT OF COMMERCE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01840)

*Eric D. McArthur* argued the cause for appellant. With him on the briefs was *Chelsea A. Priest*.

*Daniel Aguilar*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General at the time the brief was filed, and *Sharon Swingle*, Attorney.

Before: HENDERSON and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

2

*Circuit Judge* HENDERSON concurs in the judgment.

MILLETT, *Circuit Judge*:   The Department of Commerce has long regulated the export of items that have sensitive military, national security, intelligence, and foreign policy implications.   The Export Controls Act of 2018, Pub. L. No. 115-232, 132 Stat. 2209 (codified as amended at 50 U.S.C. §§ 4801–4826), legislatively confirmed that authority and statutorily empowered the President and the Secretary of Commerce to control "the export, reexport, and in-country transfer" of restricted items, as well as the "activities of United States persons, wherever located, relating to specific" weapons and intelligence activities.    50 U.S.C. §§ 4812–4813. Penalties imposed by the Act apply not just to those who directly violate its terms, but also to those who "cause or aid, [or] abet" violations.   *Id.* § 4819(a)(2)(B).

Some violations of the 2018 Export Controls Act and its implementing regulations trigger liability only if the entity acts willfully or knowingly, but others are enforced on a strict liability basis.    Federal Express Corporation—commonly known as FedEx—challenges the Department of Commerce's authority to hold it strictly liable for aiding and abetting violations of the 2018 Export Controls Act.   Because the statutory text, circuit precedent, and deference to the Executive Branch in matters of national security and foreign affairs all support Commerce's interpretation, we affirm the district court's dismissal of FedEx's complaint.

**I**

**A**

The 2018 Export Controls Act directs the President and the Secretary of Commerce "to restrict the export of items" (i) that

"would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States[,]" and (ii) as "necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. § 4811; *see id*. §§ 4812–4813. In turn, the Export Administration Regulations, 15 C.F.R. Part 730, which are authorized by the 2018 Export Controls Act, "are intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States[.]" 15 C.F.R § 730.6; *see* 50 U.S.C. § 4812(b).

As relevant in this case, those regulations include an "Entity List" that identifies the persons, governments, and other entities to whom exports are prohibited, unless licensed by the Commerce Department. 15 C.F.R. Part 744, Supp. No. 4. The regulations also include "[g]eneral [o]rders" the "terms and conditions" of which may not be violated, including orders that bar certain exports to some countries. 15 C.F.R. § 736.2(9); 15 C.F.R. Part 736, Supp. No. 1.

The 2018 Export Controls Act is only the latest version of the federal government's export control framework. The Executive and Legislative Branches have long sought to prevent exports from the United States that could assist the Nation's enemies. Before the 1940s, the United States primarily restricted exports in wartime, in response to emergency situations, or when other countries were engaged in conflict. *See* IAN F. FERGUSSON, PAUL K. KERR & CHRISTOPHER A. CASEY, CONG. RSCH. SERV., R46814, THE U.S. EXPORT CONTROL SYSTEM AND THE EXPORT CONTROL REFORM ACT OF 2018, at 2 (2021); 1 BRUCE E. CLUBB, UNITED STATES FOREIGN TRADE LAW § 8.1, at 133–134 (1991).

In 1949, Congress enacted "the first comprehensive system of export controls ever adopted * * * in peace time." CLUBB, *supra* § 8.1.2, at 135–136 (citation omitted); *see* Export Control Act of 1949, Pub. L. No. 81-11, 63 Stat. 7; JOHN R. LIEBMAN & WILLIAM A. ROOT, UNITED STATES EXPORT CONTROLS xxx–xxxi (2d ed. 1989). Since then, the statutory scheme has been repeatedly updated, refined, and reauthorized. *See, e.g.*, Export Administration Act of 1969, Pub. L. No. 91-184, 83 Stat. 841; Export Administration Act of 1979, Pub. L. No. 96-72, 93 Stat. 503.

Pursuant to those statutes, the Department of Commerce developed the Export Administration Regulations. *See* 15 C.F.R. § 730.2. Before the 2018 Export Controls Act, Congress's export administration laws were not permanent. *See* H.R. REP. NO. 115-784, at 51–52 (2018). The Export Administration Regulations were sustained by Congress's temporary legislation. Whenever those statutes lapsed, Presidential executive orders issued under the International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat. 1626 (1977) (codified at 50 U.S.C. §§ 1701–1706), "directed and authorized the continuation in force" of the Export Administration Regulations. 15 C.F.R. § 730.2.

When enacting the 2018 Export Controls Act, Congress statutorily endorsed those preexisting regulations, explicitly preserving in law "[a]ll delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the Export Administration Act of 1979 * * * or the Export Administration Regulations" that were "in effect as of August 13, 2018[.]" 50 U.S.C. § 4826(a). Congress specified that these rules and regulations were to "continue in effect according to their terms until modified,

superseded, set aside, or revoked under the authority of" the 2018 Export Controls Act. *Id.*

This case concerns the specific statutory and regulatory provisions addressing civil aiding or abetting violations of the 2018 Export Controls Act. The Act makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of [the Act] or of any regulation, order, license, or other authorization issued under [the Act], including any of the unlawful acts described in paragraph (2)." 50 U.S.C. § 4819(a)(1).

"Paragraph (2)" in turn provides an extensive list of "unlawful acts" that includes, as relevant here that "[n]o person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required by [the 2018 Export Controls Act], the Export Administration Regulations, or any order, license or authorization issued thereunder." 50 U.S.C. § 4819(a)(2).

The 2018 Export Controls Act prescribes criminal penalties for one "who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in [Section 4819(a).]" 50 U.S.C. § 4819(b).

The Act separately authorizes the Secretary of Commerce to impose "civil penalties on a person for each violation by that person of [the 2018 Export Controls Act] or any regulation, order, or license issued under [the Act.]" 50 U.S.C. § 4819(c).

The Export Administration Regulations largely mirror these statutory provisions, stating that "[n]o person may cause or aid, abet, counsel, command, induce, procure, permit, or

approve the doing of any act prohibited, or the omission of any act required, by [the 2018 Export Controls Act], the [Export Administration Regulations], or any order, license or authorization issued thereunder."   15 C.F.R. § 764.2(b).

The regulations delineate a variety of sanctions for violating these provisions, including administrative sanctions, civil penalties, denial of export privileges, and criminal punishment.   15 C.F.R. § 764.3.   The regulations specify that criminal sanctions are authorized to punish one who "willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in 50 U.S.C. [§] 4819(a)[.]"   15 C.F.R. § 764.3(b).

The regulatory provision that makes it unlawful to "cause or aid, [or] abet" an export control violation, 15 C.F.R. § 764.2(b), predates the 2018 Export Controls Act.   A version of this regulation existed as early as 1954.   At that time, the regulation made it unlawful to "knowingly" "cause, or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited by, or the omission of any act required by the export control law or any proclamation, order, rule, regulation, or license issued thereunder."   Miscellaneous Amendments, 19 Fed. Reg. 89, 92 (Jan. 7, 1954); *see also* 15 C.F.R. § 381.2 (1956).   In the 1980s, the Department of Commerce removed the word "knowingly" from the provision. 15 C.F.R. § 387.2 (1981).   The provision has remained largely unchanged since that time and was "continue[d] in effect" when the 2018 Export Controls Act was enacted.   50 U.S.C. § 4826(a).

**B**

FedEx is an international express courier that offers expedited and time-definite delivery of approximately 15 million packages daily to more than 220 countries and territories.

In 2011, the Department of Commerce's Bureau of Industry and Security ("Bureau") sent FedEx a "charging letter" alleging that FedEx had violated 15 C.F.R. § 764.2(b) six times. Specifically, the letter asserted that FedEx "caused, aided or abetted" acts "prohibited by the [Export Administration] Regulations" when it transported items to Syria, the United Arab Emirates, and China without the required licenses. Joint Appendix ("J.A.") 74–79. In sending items to Syria and the United Arab Emirates, FedEx had allegedly violated two "general orders" promulgated under the Export Administration Regulations. 15 C.F.R. Part 736, Supp. No. 1. FedEx and the Bureau reached a settlement agreement under which FedEx paid a $370,000 civil penalty.

In 2017, the Bureau sent another charging letter to FedEx, this time alleging that FedEx had committed 53 violations of 15 C.F.R. § 764.2(b). Specifically, the Bureau accused FedEx of "caus[ing], aid[ing] or abett[ing]" a violation of the 2018 Export Controls Act and its implementing regulations when it "facilitated the export" of a variety of civil aircraft parts and equipment either to France or Pakistan without the required licenses. J.A. 51–52 (citing 15 C.F.R. § 764.2(b)). The charging letter asserted that the items were sent either to Aerotechnic France SAS, a company that the Bureau previously determined had "engaged in actions that could enhance the military capability of Iran," or to the Pakistan Institute for Nuclear Science and Technology, a subordinate

entity of the Pakistan Atomic Energy Commission. J.A. 52 (citation omitted). Aerotechnic France SAS and the Pakistan Institute for Nuclear Science and Technology had both been on the Bureau's Entity List for years.[1] The Bureau alleged that FedEx "knew or should have known" that "its screening software did not flag a transaction unless the name of the recipient/consignee exactly matched the full name of the entity as found on the Entity List, even where the address information was identical or nearly identical." J.A. 53.

FedEx settled again, this time for a civil penalty of $500,000. FedEx also agreed, among other stipulations, to "complete external audits of its export controls compliance program covering FedEx fiscal years 2017–2020[.]" J.A. 40. Under both settlements, FedEx agreed to "waive[] all rights to further procedural steps in this matter" including any right to "seek judicial review or otherwise contest the validity of this Agreement[.]" J.A. 48, 71.

## C

About a year later, FedEx filed a complaint in federal district court against the Department of Commerce, the Bureau of Industry and Security, as well as the Secretary of Commerce and the Assistant Secretary for Industry and Analysis in their official capacities (collectively, "Commerce"). FedEx's operative complaint challenges Commerce's strict liability interpretation of 15 C.F.R. § 764.2(b) as *ultra vires*—that is, in

---

[1] *See* 15 C.F.R. Part 744, Supp. No. 4; India and Pakistan Sanctions and Other Measures, 63 Fed. Reg. 64,322, 64,337 (Nov. 19, 1998) (adding the Pakistan Institute for Nuclear Science and Technology); Addition of Certain Persons on the Entity List: Addition of Persons Acting Contrary to the National Security or Foreign Policy Interests of the United States, 76 Fed. Reg. 37,632, 37,632 (June 28, 2011) (adding Aerotechnic France SAS).

clear excess of statutory authority—and as violating the substantive protections of the Fifth Amendment's Due Process Clause.

The district court granted Commerce's motion to dismiss the complaint. With respect to the due process claim, the district court held that Commerce's "strict-liability regime to prevent companies from aiding and abetting export violations that would jeopardize the country's national security or foreign policy interests" survived rational basis review. *Federal Express Corp. v. Department of Com.*, 486 F. Supp. 3d 69, 76 (D.D.C. 2020).

The district court also dismissed FedEx's *ultra vires* challenge. The court reasoned that neither the plain text of the Department of Commerce's regulation, 15 C.F.R. § 764.2(b), nor Commerce's interpretation of its regulation were *ultra vires* because interpreting the regulation to impose strict liability for aiding or abetting did not "patently misconstrue[] [the] statute, disregard[] a specific and unambiguous statutory directive, or violate[] a specific command of [the] statute." *Federal Express Corp.*, 486 F. Supp. 3d at 81 (citation omitted).

FedEx timely appeals only the dismissal of its *ultra vires* claim. FedEx Opening Br. 11 n.4.

**II**

We have jurisdiction under 28 U.S.C. § 1291. We review *de novo* the district court's dismissal of a complaint for failure to state a claim, FED. R. CIV. P. 12(b)(6), "accepting the factual allegations made in the complaint as true and giving [the] plaintiff[] the benefit of all inferences that can reasonably be drawn from [its] allegations[,]" *Emory v. United Air Lines, Inc.*, 720 F.3d 915, 921 (D.C. Cir. 2013) (quoting *Wagener v. SBC*

*Pension Benefit Plan-Non Bargained Program*, 407 F.3d 395, 401 (D.C. Cir. 2005)).

## III

### A

FedEx is unable to bring a traditional Administrative Procedure Act ("APA") challenge to Commerce's interpretation of its regulation because the 2018 Export Controls Act provides that the "functions" the Department of Commerce exercises under that Act "shall not be subject to" the judicial review sections of the APA. 50 U.S.C. § 4821(a). For that reason, FedEx seeks nonstatutory review of Commerce's strict-liability standard on the ground that the agency has acted patently in excess of its statutory authority.

Long before the APA, the "main weapon in the arsenal for attacking federal administrative action" was a suit in equity seeking injunctive relief. KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 18.4, at 179 (3d ed. 1994); *see Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir. 1988); *see, e.g.*, *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (commonly cited as the wellspring of nonstatutory review of agency action).

Such review, commonly known as an *ultra vires* claim, is available where (i) there is no express statutory preclusion of all judicial review; (ii) "there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory[.]" *Nyunt v. Chairman, Broadcasting Board of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (internal quotation marks and citation

omitted); *see also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).

Judicial review for *ultra vires* agency action "rests on the longstanding principle that if an agency action is 'unauthorized by the statute under which [the agency] assumes to act,' the agency has 'violate[d] the law' and 'the courts generally have jurisdiction to grant relief.'" *National Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022) (quoting *McAnnulty*, 187 U.S. at 108). This nonstatutory form of judicial review survived the enactment of the APA. *Dart*, 848 F.2d at 224 ("Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review."); *see, e.g.*, *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).

In *Leedom v. Kyne*, the Supreme Court explained that an *ultra vires* challenge is distinct from statutory review of an agency action taken "within [the agency's] jurisdiction," and is available only for the narrow purpose of obtaining injunctive relief against agency action taken "in excess of its delegated powers and contrary to a specific prohibition" in the law. 358 U.S. at 188. In assessing an *ultra vires* claim, we apply that exacting standard of review in analyzing both "the extent of the agency's delegated authority" and "whether the agency has acted within that authority." *National Ass'n of Postal Supervisors*, 26 F.4th at 970 (citation omitted).

As a result, *ultra vires* claims are confined to "extreme" agency error where the agency has "stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]" *Griffith*, 842 F.2d at 493 (quoting *Local 130, Int'l Union of Elec., Radio & Mach. Workers v. McCulloch*, 345 F.2d 90, 95 (D.C. Cir. 1965)). Only error that is "patently a misconstruction of the Act," that "disregard[s] a specific and

unambiguous statutory directive," or that "violate[s] some specific command of a statute" will support relief. *Id.* (internal quotation marks and citations omitted); *see National Ass'n of Postal Supervisors*, 26 F.4th at 971 (The "challenged [agency] action must 'contravene[] a clear and specific statutory mandate' to be susceptible to *ultra vires* review.") (citation omitted).

**B**

The parties no longer contest that the first two prongs of an *ultra vires* claim are met here because the 2018 Export Controls Act does not expressly preclude all judicial review, and no alternative procedure for review of FedEx's claim exists. FedEx Opening Br. 16–17; FedEx Reply Br. 23; Gov't Br. 18; *see Nyunt*, 589 F.3d at 449. The dispute on appeal centers on whether FedEx has demonstrated the type of extreme agency error needed to demonstrate that Commerce acted *ultra vires.*

On that question, FedEx disagrees that its claim is subject to exacting review, arguing that it need only that show that Commerce "has exceeded its statutory authority" under a routinely deferential standard apparently akin to that of *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842–844 (1984). FedEx Opening Br. 16–17.

FedEx argues that the requirement of showing a "patent violation of agency authority," FedEx Opening Br. at 17 (quoting *American Clinical Laboratory Ass'n v. Azar*, 931 F.3d 1195, 1208 (D.C. Cir. 2019)), applies only when Congress is understood generally to have precluded all statutory judicial review, *id*. at 16 n.5 (citing *American Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238 (D.C. Cir. 2020)). When, as here, Congress "withdraws only the APA cause of action" and does not

reference other forms of judicial review, FedEx says that it need only show that the agency crossed statutory lines. FedEx Opening Br. 16 n.5.

FedEx's effort to dilute *ultra vires* review to the functional equivalent of the very APA action that Congress prohibited defies precedent and logic.

To start, the Supreme Court and this court have long required in *ultra vires* cases that the agency action go beyond mere legal or factual error and amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless" agency action. *Oestereich v. Selective Serv. Sys. Loc. Board No. 11*, 393 U.S. 233, 238 (1968). Said another way, "[g]arden-variety errors of law or fact are not enough." *Griffith*, 842 F.2d at 493; *see Local 130, IUERMW*, 345 F.2d at 95; *National Air Traffic Controllers Ass'n v. Federal Service Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006) (To succeed, an *ultra vires* claimant must show that the agency "has acted 'in excess of its delegated powers and contrary to a specific prohibition' which 'is clear and mandatory'") (quoting *Kyne*, 358 U.S. at 188); *Florida Health Sciences Ctr. v. Secretary of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) ("To challenge agency action on the ground that it is *ultra vires*, [plaintiff] must show a 'patent violation of agency authority.'") (citation omitted).

An *ultra vires* challenge, in other words, is "essentially a Hail Mary pass[.]" *Nyunt*, 589 F.3d at 449. The agency overstep must be "plain on the record and on the face of the [statute.]" *Oestereich*, 393 U.S. at 238 n.7. That demanding standard is necessary because *ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not "barred judicial comparison of agency action

with plain statutory commands[.]" *Dart*, 848 F.2d at 222 (citation omitted); *see Local 130, IUERMW*, 345 F.2d at 95 ("Infirmities short of" stepping "plainly beyond the bounds" of a statute are insufficient in large part because our review of agency action is not "in [a] manner [expressly] provided by Congress.").

Because nonstatutory review of agency action rests on that narrow presumption, challengers must show more than the type of routine error in "statutory interpretation or challenged findings of fact" that would apply if Congress had allowed APA review. *Local 130, IUERMW*, 345 F.2d at 95; *see National Ass'n of Postal Supervisors*, 26 F.4th at 971, 975 (*ultra vires* review looks first at whether the agency contravened a "clear and specific statutory mandate," and then, if applicable, whether the agency's statutory construction is "utterly unreasonable"). In other words, *ultra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand.

That same demanding standard for judicial intervention applies even when Congress has only withdrawn APA review, rather than cut off all statutory judicial review. In *Nyunt*, after concluding that judicial review under the APA was unavailable but that not all avenues of statutory review were foreclosed as a general matter, this court nevertheless applied a "very stringent standard," requiring the plaintiffs to demonstrate "the kind of 'extreme' error that would justify reliance on the *Leedom v. Kyne* exception." 589 F.3d at 449; *see Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (emphasizing that *ultra vires* review is "quite narrow" in case where statute withheld only APA review). To that same point, in *Trudeau v. FTC* we explained that if the plaintiff's claims would have failed under the APA, then those same claims necessarily "could not succeed under" *ultra vires* review,

which has an even "narrow[er] scope[.]" 456 F.3d 178, 190 (D.C. Cir. 2006).

FedEx relies on several cases to back up its claim for gentler review of *ultra vires* challenges when, as here, Congress has withdrawn only APA review. None of the cases supports that approach.

First, contrary to FedEx's reading, *Aid Association for Lutherans v. United States Postal Service* actually points to a demanding standard of review by drawing heavily on *McAnnulty*, *Kyne*, and their progeny when determining the availability of *ultra vires* relief. 321 F.3d 1166, 1173 (D.C. Cir. 2003).

Even more to the point, that case expressly did not address whether there is a delta between *ultra vires* review and less-exacting review under *Chevron*. Instead of parsing the differences in the two standards, the *Aid Association* court ruled instead that the question was "abstractly interesting, but ultimately unimportant in the resolution of this matter" because the claim failed under either standard. 321 F.3d at 1174; *see id.* at 1175 ("This being the case, the regulations cannot survive judicial review under *National Association* or *Chevron*.").

Second, neither does *Northern Air Cargo v. United States Postal Service* support a diluted *ultra vires* standard. 674 F.3d 852 (D.C. Cir. 2012). We had no occasion even to decide the question in that case because the agency had "never actually advanced any interpretation, let alone an authoritative one[.]" *Id.* at 860. The most that *Northern Air Cargo* says is that the "pre-existing administrative law requirement[]" that agency action "can be upheld only on the basis of contemporaneous justification by the agency itself" applies to *ultra vires* suits. *Id.* (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)).

Third, *American Hospital Association v. Azar* is of no help to FedEx because it addressed a different question. 964 F.3d 1230. The issue in *American Hospital Association* was whether a change in hospital reimbursement rates under the Medicare program was the type of agency action that fell within a statutory prohibition on all judicial review. *Id.* at 1337–1238. The hospitals in that case argued that the reimbursement did not fall within the judicial review bar, and so they sought review directly under the statute. They did not seek nonstatutory review like FedEx does. *See id.* at 1239 (court noting that it is "not asked to remedy a 'statutory violation[] even when a statute precludes review'") (citation omitted). The government did suggest that *ultra vires* review applied, but this court declined to reach the question because it first had to determine the scope of the statutory "bar on judicial review." *Id.* at 1240.[2]

Finally, this court has recently reconfirmed that *ultra vires* review imposes the same demanding standard in all cases, including those where only APA review is foreclosed. *National Ass'n of Postal Supervisors*, 26 F.4th at 966 (citing

---

[2] In one sentence in a footnote in FedEx's opening brief, FedEx claims that Commerce did not exercise a "function[]" under the Export Administration Regulations because it acted *ultra vires*, and thus the bar on APA review does not apply. 50 U.S.C. § 4821(a) ("Except as provided * * * the functions exercised under [the 2018 Export Controls Act] shall not be subject to" judicial review under the APA.); FedEx Opening Br. 16–17 n.5. This argument merely repackages FedEx's *ultra vires* claim and is unlike the statutory interpretation argument made in *American Hospital Association* because FedEx's argument does not turn on the meaning of "functions[.]" 50 U.S.C. § 4821(a). Anyhow, an inchoate argument made only in a footnote is forfeited. *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).

*Mittleman*, 757 F.3d at 307); *see Mittleman*, 757 F.3d at 305 (explaining that the relevant statute precludes judicial review under the APA). To be ruled *ultra vires*, the challenged action must "contravene[] a clear and specific statutory mandate[,]" *National Ass'n of Postal Supervisors*, 26 F.4th at 971 (citation omitted), and the statutory construction adopted by an agency will be held "impermissible" only if it is "utterly unreasonable," *id.* at 975 (quoting *Aid Ass'n for Lutherans*, 321 F.3d at 1174); *see also id.* at 971 (applying *Aid Ass'n for Lutherans*, *Northern Air Cargo*, *Nyunt*, and *DCH Regional Medical Center*). We reemphasize that rigorous standard for *ultra vires* review today, even in cases in which Congress has only expressly withdrawn APA review.

## IV

With the standard for FedEx's *ultra vires* claim settled, we turn to the merits. FedEx challenges Commerce's interpretation of its causing, aiding, or abetting regulation to apply strict liability, 15 C.F.R. § 764.2(b), as plainly exceeding its regulatory authority under the 2018 Export Controls Act. FedEx, however, has failed to demonstrate the type of blatant error necessary for an *ultra vires* challenge to succeed.

## A

We note at the outset that the *mens-rea*-omitting text of Commerce's cause, aid, or abet regulation falls squarely within its statutory authority. Section 4819 of the 2018 Export Controls Act expressly provides that "[n]o person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required by" export control laws. 50 U.S.C. § 4819(a)(2)(B). No *mens rea* is prescribed.

Commerce's regulation uses identical wording, specifying that "[n]o person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required" by export control laws. 15 C.F.R. § 764.2(b). Also like the statute, the regulation does not specify a *mens rea* for violation of its provisions. A regulation that so faithfully hews to the statute it enforces is the antithesis of a facially *ultra vires* regulation.

FedEx nevertheless argues that Commerce has crossed the *ultra vires* line by interpreting that regulation "to hold common carriers strictly liable for aiding and abetting and causing export violations[.]" FedEx Opening Br. 41. That argument fails for three reasons.

**1**

The first barrier to FedEx's *ultra vires* challenge is that Commerce's interpretation of its regulation to allow for strict liability in civil enforcement actions does not contravene any clear statutory command.

As noted, the 2018 Export Controls Act itself omits any *mens rea* requirement from its civil aiding or abetting prohibition. 50 U.S.C. § 4819(a)(2)(B). That omission stands in sharp contrast to a neighboring provision in which Congress specified the mental state required for a violation. Section 4819(b) allows the imposition of *criminal* penalties only if the person "willfully * * * aids and abets in the commission of[] an unlawful act[.]" 50 U.S.C. § 4819(b). Then, in the succeeding subsection addressing *civil* penalties, the statute is again silent about *mens rea*. *Id.* § 4819(c). The Act's repeated omission of any state of mind requirement for civil liability and penalties weighs mightily against FedEx's

argument that the statute's civil aiding and abetting prohibition plainly requires a culpable mind.

Congress similarly picked and chose when to prescribe and when to omit a specific state of mind requirement for other violations of the 2018 Export Controls Act.  For example, the Act specifies that "[n]o person may engage in any transaction or take any other action with intent to evade the provisions of" the Export Controls Act of 2018, "the Export Administration Regulations, or any order, license, or authorization issued thereunder."   50 U.S.C. § 4819(a)(2)(G).   The statute likewise specifies that "[n]o person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service * * * any item exported or to be exported from the United States, or that is otherwise subject to the Export Administration Regulations, with knowledge that a violation of" export control laws "has occurred, is about to occur, or is intended to occur in connection with the item[.]"   *Id.* § 4819(a)(2)(E).   Both of these provisions clearly contain a *mens rea* requirement.

Congress's silence as to the state of mind required for a violation of still other provisions, including the neighboring Section 4819(a)(2)(b), indicates that Congress chose not to foreclose a lesser *mens rea* or strict liability standard there. After all, when Congress "includes particular language in one section of a statute but omits it in another section of the same Act," courts presume that Congress knew what it was doing and meant for the omission to have significance.  *Bates v. United States*, 522 U.S. 23, 29–30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (applying that same selective-use principle to support the conclusion that a criminal offense did not include "an 'intent to defraud' state of mind requirement"); *accord Dean v. United States*, 556 U.S. 568, 573 (2009) (applying selective-use principle in concluding that

a statutory sentencing enhancement for a criminal offense did not include an intent requirement).

Closing the door even more firmly on FedEx's *ultra vires* argument is Congress's express delegation to Commerce to provide by regulation "standards for establishing levels of civil penalty" under Section 4819(c) "based upon factors such as * * * the culpability of the violator[.]" 50 U.S.C. § 4819(c)(3). Congress, in other words, left it to Commerce to determine the role of "culpability" in the assessment of civil penalties. Culpability, of course, can range from a non-culpable mind to intentional violations, leaving no room for FedEx's insistence that Congress required a specific knowledge *mens rea*.[3]

Lastly, it bears noting that the omission of a *mens rea* requirement from the regulation is longstanding. Commerce removed a requirement that the violator act "knowingly" three decades ago, and has long interpreted the regulation to impose

---

[3] Exercising the discretion Congress afforded, Commerce has factored the culpability of the actor into the penalty, rather than liability, calculus. Under the regulations, the Bureau will "consider some or all" of a variety of "aggravating factors" when "determining the appropriate sanctions in administrative cases, including the appropriate amount of a civil monetary penalty[.]" 15 C.F.R. Part 766, Supp. No. 1. Those aggravating factors include: "apparent willfulness or recklessness[,]" "pattern or practice of conduct[,]" and "notice" that the conduct "constituted a violation of U.S. law[.]" *Id.* The regulations observe that "[m]any apparent violations are isolated occurrences, the result of a good-faith misinterpretation, or involve no more than simple negligence or carelessness. In such instances, absent the presence of aggravating factors, the matter frequently may be addressed with a no action determination letter or, if deemed necessary, a warning letter." *Id.*

strict liability.[4]   Yet Congress expressly carried the *mens-rea-less* regulation forward in the 2018 Export Controls Act.   50 U.S.C. § 4826(a); *see also id.* § 4819(a)(2)(B) ("No person may cause or aid[] [or] abet, * * * the doing of any act prohibited, or the omission of any act required by this subchapter [or] the Export Administration Regulations[.]"); *cf. Gordon v. United States Capitol Police,* 778 F.3d 158, 165 (D.C. Cir. 2015) ("Where Congress 'adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.'") (citation omitted).

Taken together, these textual indicia firmly establish that Commerce's interpretation of the statute and its parallel regulation as allowing for strict liability is not "plainly beyond the bounds of [its statutory authority]" or "clearly in defiance of it[.]"   *Griffith*, 842 F.2d at 493 (citation omitted).

---

[4]   *See In re Micei Int'l*, 74 Fed. Reg. 24,788, 24,794 (May 26, 2009) ("As with most of the 764.2 provisions, 764.2(b) of the Regulations is a strict liability offense"); *Recommended Decision & Order; In re Kabba & Amir Invs., Inc.*, 73 Fed. Reg. 25,649, 25,652 (May 7, 2008), *aff'd In re Kabba & Amir Invs., Inc.*, 73 Fed. Reg. 25,648 (May 7, 2008) (The Bureau "correctly argues that [the company's] knowledge of the violation is irrelevant in determining whether a violation occurred because 15 [C.F.R.] 764.2(b) is strict liability.   Knowledge or intent is simply not a requisite element of proof for an aiding or abetting violation."); *In re Petrom GmbH Int'l Trade*, 70 Fed. Reg. 32,743, 32,754 (June 6, 2005); *Rotler*, 58 Fed. Reg. 62,095, 62,099 (Nov. 24, 1993); *see also Iran Air v. Kugelman*, 996 F.2d 1253, 1259 (D.C. Cir. 1993) (Commerce defending strict liability interpretation before this court).

**2**

FedEx's *ultra vires* argument runs into a second headwind—relevant circuit precedent.

In *Iran Air v. Kugelman*, this court upheld under APA review Commerce's interpretation of "causing" a prohibited act as a strict liability offense. 996 F.2d 1253, 1257–1259 (D.C. Cir. 1993) (interpreting 15 C.F.R. § 787.2 (1992), now codified at 15 C.F.R. § 764.2(b)). *Iran Air* thus specifically upholds a strict-liability interpretation of "causing." And "causing" is part of the same string of verbs in the same sentence in 15 C.F.R. § 764.2(b) as aiding or abetting; in fact, "causing" directly precedes "aid" and "abet." We held in *Iran Air* that Commerce's strict-liability reading of that regulatory term was reasonable and within its statutory authority. 996 F.2d at 1255, 1258. The relevant statutory provisions, we explained, "appear to leave room for civil penalty regulations" that allow "the imposition of strict liability." *Id.* at 1259. "It is not unusual[,]" we added, "for Congress to provide for both criminal and administrative penalties in the same statute and to permit the imposition of civil sanctions without proof of the violator's knowledge." *Id.* at 1258.

Given that this circuit has already specifically held that Commerce can attach strict liability to the first term in the string of verbs "cause or aid, abet, counsel, command, induce, procure, permit, or approve[,]" 15 C.F.R. § 764.2(b), there is no basis for this court to hold that Commerce acted *ultra vires* in attaching that same strict-liability reach to the next two verbs.

**3**

If more were needed, the *coup de grâce* for FedEx's *ultra vires* argument would be the well-established rule of judicial deference to the Executive Branch in matters that involve foreign policy and national security.

Ample Supreme Court precedent counsels that courts accord special deference to an agency construction of a statute "in the areas of foreign policy and national security" in light of "the volatile nature of [such] problems[,]" over which the Political Branches each have preeminent expertise. *Haig v. Agee*, 453 U.S. 280, 291 (1981); *see Regan v. Wald*, 468 U.S. 222, 242–243 (1984) (applying "classical deference to the [P]olitical [B]ranches in matters of foreign policy" to "sustain the President's decision to curtail the flow of hard currency to Cuba" by restricting travel).

This court too has often noted that, "[b]y long-standing tradition, courts have been wary of second-guessing executive branch decision[s] involving complicated foreign policy matters." *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 104 F.3d 1349, 1353 (D.C. Cir. 1997); *see Islamic American Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). Indeed, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Zivotofsky v. Secretary of State*, 725 F.3d 197, 219 (D.C. Cir. 2013) (quoting *Agee*, 453 U.S. at 292); *accord Palestine Info. Off. v. Shultz*, 853 F.2d 932, 942 (D.C. Cir. 1988).

That rule of deference applies with full force here. The 2018 Export Controls Act and its implementing regulations fall

in the core of Executive and Legislative Branch expertise in the areas of national security and foreign affairs. The Act regulates the movement across the United States' borders of items that could pose a grave risk to our national security if they were to fall into the wrong hands. Congress has specifically determined in the 2018 Export Controls Act that "[t]he national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items" be regulated to "control the release of items for use" in "the proliferation of weapons of mass destruction or of conventional weapons[,]" "the acquisition of destabilizing numbers or types of conventional weapons[,]" "acts of terrorism[,]" and other harmful uses. 50 U.S.C. § 4811(2). In addition, export controls aim to "preserve the qualitative military superiority of the United States" and to "strengthen the United States defense industrial base." *Id.*; *see also* 15 C.F.R § 730.6.

These issues lie at the heart of the United States' national security and foreign policy interests. So our analysis of Commerce's efforts to protect the Nation's security and to prevent bad actors from acquiring restricted items must afford substantial deference to the judgments of the agency charged with enforcing the statute's export control program. Given that deference, we would be hard-pressed to hold that the law plainly forecloses Commerce from interpreting its regulation to strike the *mens rea* balance in favor of protecting the Nation's security.[5]

---

[5] While this case concerns only civil liability, there is no question that Congress can allow even for "strict criminal liability" when necessary to protect the public welfare. *Staples v. United States*, 511 U.S. 600, 606 (1994). While "[h]ardship there doubtless may be" when actions are penalized even though "consciousness of wrongdoing be totally wanting[,]" *United States* v. *Dotterweich*, 320

**B**

FedEx counters that "aiding and abetting" in the tort liability context requires "knowledge of unlawful activity and the intent to facilitate it[,]" and that Congress incorporated that common-law meaning into the 2018 Export Controls Act. FedEx Opening Br. 13–14. That argument is far too frail a reed on which to rest an *ultra vires* claim.

To start, we only "presume that Congress incorporates the common-law meaning of the terms it uses if those 'terms have accumulated settled meaning under the common law' and 'the statute does not otherwise dictate.'" *United States v. Wells*, 519 U.S. 482, 491 (1997) (formatting modified and citation omitted). So a "common-law term of art" should not be given its common-law meaning "where that meaning does not fit." *United States v. Castleman*, 572 U.S. 157, 163 (2014) (citation omitted). Here, the statute indicates that the common-law meaning is out of place with its selective inclusion and omission of a *mens rea*, and Congress's express affirmation of established agency regulations and orders. *See supra* Part IV.A.1. And rotely imposing common-law principles is especially inapt for a statute so deeply tied to foreign policy and national security. *See Agee*, 453 U.S. at 292. In fact, the common law on which FedEx relies is a misfit in many respects.

---

U.S. 277, 284 (1943), Congress—or in this case, Commerce—may reasonably conclude, after "[b]alancing [the] relative hardships," that the public interest is better served by placing the risk of harm "upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of [others]," *id.* at 285.

To start, the common law of tort does not so clearly or uniformly require a knowledge *mens rea* as FedEx supposes.

Certainly some jurisdictions do require "actual knowledge" of the primary wrongdoer's tortious activity for civil aiding and abetting liability.[6] But others require only a general awareness of the primary tortfeasor's wrongdoing.[7] Still other jurisdictions have held that recklessness or

---

[6] *See, e.g.*, *Alarmex Holdings, LLC v. JP Morgan Chase Bank, N.A.*, 48 N.Y.S.3d 19, 20 (N.Y. App. Div. 2017) (dismissing complaint that alleged claim for aiding and abetting conversion because it failed "to allege facts showing that defendant had actual knowledge of [the primary wrongdoer's] fraud"); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (New York law requires "actual knowledge" to establish liability for aiding and abetting a tort); *Casey v. United States Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405–408 (Cal. Ct. App. 2005); *Invest Almaz v. Temple-Inland Forest Prods. Corp.*, 243 F.3d 57, 82–83 (1st Cir. 2001) (predicting that New Hampshire would adopt the tort of aiding and abetting a breach of fiduciary duty and would require "actual knowledge" of the breach of fiduciary duty to impose liability); *Johnson v. Filler*, 109 N.E.3d 370, 376 (Ill. App. Ct. 2018); *see also* Restatement (Third) of Torts: Liability for Economic Harm § 28, note c (2020).

[7] *See, e.g.*, *Halberstam v. Welch*, 705 F.2d 472, 477, 485 n.14 (D.C. Cir. 1983) ("[D]efendant must be generally aware of his [or her] role as part of an overall illegal or tortious activity at the time that he [or she] provides the assistance[.]"); *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Trust Fund*, 38 P.3d 12, 26 (Ariz. 2002) (approving "general awareness" standard); *FDIC v. First Interstate Bank of Des Moines, N.A.*, 885 F.2d 423, 431 (8th Cir. 1989) (knowledge may be proven by a "general awareness of [defendant's] overall role" in the primary wrongdoer's "scheme"; "actual knowledge" is not required); *York v. InTrust Bank, N.A.*, 962 P.2d 405, 424–425 (Kan. 1998).

constructive knowledge may suffice.[8]   This variation takes the air out of FedEx's insistence that there was a "settled meaning under the common law" for aiding and abetting liability, *Wells*, 519 U.S. at 491 (formatting modified and citation omitted).

Even more relevantly, that variation in tort law's *mens rea* requirement as to aiding and abetting liability is amplified when the underlying primary tort is itself a strict liability tort. FedEx concedes that at least some violations of the Export Administration Regulations are strict liability offenses. FedEx Reply Br. 9 n.4; *see* Oral Arg. Tr. 34:18–20.   The Second Restatement of Torts, on which FedEx relies, specifically carves out from any *mens rea* requirement for civil aiding and abetting liability the situation "when the conduct of either the [aider or abettor] or the [primary tortfeasor] is free from intent to do harm or negligence but involves strict liability for the resulting harm."   Restatement (Second) of Torts § 876 (1979).   In those scenarios, strict liability is imposed "not on the ground that the conduct upon which it is based is wrongful," but because "the conduct, although lawful because of the importance of the enterprise to the community, creates such great risk of harm to third persons that it is fair that the one conducting the enterprise should be required to compensate for the harm caused by it."   *Id.* cmt. f.   Ultimately, the Second Restatement took "no position" as to the liability of the aider

---

[8]   *See*, *e.g.*, *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) ("To establish *scienter*, the plaintiff must demonstrate that the aider and abettor had 'actual or constructive knowledge that their conduct was legally improper.'") (citation omitted); *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 775 (S.D. 2002) ("Although in some instances actual knowledge may be required, constructive knowledge will often suffice."); *cf. Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) (adopting a sliding-scale approach between actual and constructive knowledge).

and abettor when the underlying primary tort was one of strict liability. *Id.* § 876. Which underscores that, even when measured against the common law, Commerce's position is not beyond the bounds of reason.

Since FedEx has not shown that its asserted *mens rea* requirement for aiding and abetting liability was truly settled in the common law at the time the statute was promulgated, or that its common-law meaning fits within this specialized national-security scheme, FedEx's argument does not come close to satisfying the strict standard for an *ultra vires* claim. In fact, the canon of interpretation that "when a statutory term is obviously transplanted from another legal source, it brings the old soil with it" cuts the other way in this case. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (formatting modified and citation omitted). The more obvious legal backdrop for Congress to have acted against in the 2018 Export Controls Act is Commerce's "causing, aiding, or abetting" regulation, 15 C.F.R. § 764.2(b), which predated the Act, has long been interpreted as a strict liability offense, *see* n.4, *supra*, and which Congress explicitly embraced in the Act, 50 U.S.C. § 4826(a). *See Wells*, 519 U.S. at 492 (rejecting proposed common-law meaning where "[s]tatutory history confirm[ed] the natural reading" of the statute).

## V

FedEx's last attempt to demonstrate that Commerce has acted *ultra vires* rests on the canon of constitutional avoidance. FedEx Opening Br. 38–40. No dice.

The "canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). "[T]hose

who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998); *see also Rust v. Sullivan*, 500 U.S. 173, 191 (1991) ("Applying th[is] canon of construction" to regulations and holding that those regulations "d[id] not raise the sort of 'grave and doubtful constitutional questions[]' that would lead us to assume Congress did not intend to authorize their issuance.") (citation omitted); *Weaver v. United States Info. Agency*, 87 F.3d 1429, 1436 (D.C. Cir. 1996) (applying the canon to regulations as well as statutes).

FedEx argues that the canon applies because the imposition of strict liability for aiding or abetting offenses raises "serious fair notice and vagueness concerns" under the Due Process Clause of the Fifth Amendment. FedEx Opening Br. 2. Even assuming that an arguable constitutional concern would be enough to demonstrate that Commerce acted *ultra vires*, FedEx has not made that showing.

The Due Process Clause's fair notice requirement generally requires only that the government make the requirements of the law public "and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). "Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid." *Id.* (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).

As a result, a statute or regulation is considered unconstitutionally vague only if, "applying the rules for interpreting legal texts, its meaning specifies no standard of

conduct at all." *Bronstein*, 849 F.3d at 1107 (formatting modified and citation omitted). The key question, then, is whether the law or regulation "provides a discernable standard when legally construed." *Id.*

Commerce's strict-liability interpretation of its regulation and the parallel statutory provision satisfies that fair notice requirement.

To start, FedEx has already twice before been subjected to strict liability charges under this very regulation, once in 2011 and again in 2017. Both times it settled the claims. So FedEx has long had actual notice of Commerce's strict-liability interpretation and application of the regulation.

In addition, Commerce's interpretation is long-lived. *See* n.4, *supra*. And the plain text of the 2018 Export Controls Act textually preserves that preexisting regulatory standard. 50 U.S.C. § 4819(a)(2)(B).

If more were needed, this court has already held that "the language of the statute and the pertinent regulations adequately indicated that civil sanctions could be assessed on a strict liability basis." *Iran Air*, 996 F.2d at 1259.

Finally, the statute's express state of mind requirements for criminal punishment, but silence as to civil sanctions, gives notice that civil penalties may be assessed on a strict liability basis. This is because there is a "strong presumption that Congress expresses its intent through the language it chooses[,]" including when it chooses to omit language that it used in a different part of a statute. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 & n.12 (1987). Plus, the levy of civil sanctions without a state of mind requirement is not uncommon. *See Iran Air*, 996 F.2d at 1258.

## VI

For all of those reasons, we hold that Commerce's regulation, 15 C.F.R. § 764.2(b), and its strict-liability interpretation of it are not *ultra vires*. The judgment of the district court granting the Department of Commerce's motion to dismiss for failure to state a claim is affirmed.

*So ordered.*