# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 3, 2023          Decided July 26, 2024

No. 22-1052

AMAZON SERVICES LLC,
PETITIONER

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
RESPONDENT

———

On Petition for Review of an Order
of the Department of Agriculture

———

*William Brendan Murphy* argued the cause for petitioner. With him on the briefs were *Alison R. Caditz* and *Lawrence Reichman*.

*Brad Hinshelwood*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney.

Before: SRINIVASAN, *Chief Judge*, WALKER, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

2

SRINIVASAN, *Chief Judge*: The Plant Protection Act and the Animal Health Protection Act authorize the Department of Agriculture to penalize entities that "aid, abet, cause, or induce" the unlawful importation of plant and animal products. This case arose from overseas sellers' shipments of plant and animal products to Amazon fulfillment centers in the United States for eventual distribution to domestic consumers. Federal agents seized the packages and determined that they contained noncomplying products. The Department concluded that Amazon, by making available its fulfillment centers and providing associated fulfillment services, had aided, abetted, caused, or induced the overseas sellers' unlawful importations. The Department imposed a $1 million fine against Amazon.

We set aside the Department's order. As the Supreme Court recently explained, civil aiding-and-abetting liability generally attaches only to conscious and culpable participation in unlawful conduct. The Plant Protection Act and Animal Health Protection Act incorporate that settled understanding. While overseas sellers might use Amazon's fulfillment service in furtherance of unlawfully importing their products, Amazon's mere provision of a neutral service does not amount to conscious and culpable participation in the sellers' wrongdoing. We therefore grant Amazon's petition for review.

I.

A.

The Plant Protection Act (PPA) seeks to ensure the "detection, control, eradication, suppression, prevention, [and] retardation of the spread of plant pests or noxious weeds." 7 U.S.C. § 7701(a). The Animal Health Protection Act (AHPA) similarly aims to ensure the "prevention, detection, control, and

eradication of diseases and pests of animals." *Id.* § 8301(a). To those ends, the PPA and AHPA authorize the Secretary of Agriculture to prohibit or restrict the importation of plant and animal products, respectively, as necessary to prevent the introduction of diseases into or the dissemination of diseases in the United States. *Id.* §§ 7712(a), 8303(a)(1). Both statutes allow the Secretary to impose civil and criminal penalties on persons who violate the statutes or the Secretary's implementing regulations. *Id.* §§ 7734, 8313; *see also id.* §§ 7702(19), 8302(16).

A person imports a covered product by "mov[ing]" it into "the territorial limits of the United States." *Id.* §§ 7702(5), 8302(7). And, of particular relevance here, the statutes define "mov[ing]" a covered product to include, among other actions, "aid[ing], abet[ting], caus[ing], or induc[ing]" the "carrying, entering, importing, mailing, shipping, or transporting" of the covered product into the United States. *Id.* §§ 7702(9)(B), 8302(12)(B). In other words, a person who aids, abets, causes, or induces the importation of a covered product in violation of the PPA or AHPA is herself liable for violating the statute.

When the Department of Agriculture suspects that a person has violated either statute, it may initiate enforcement proceedings by filing an administrative complaint. *See* 7 C.F.R. §§ 1.131, 1.133(b)(1). The proceeding is assigned to an agency administrative law judge (ALJ) who makes an initial decision. *Id.* § 1.132. Parties can appeal the ALJ's decision to the Department's Judicial Officer, *id.* § 1.145(a), who exercises authority delegated by the Secretary and acts as the agency's final adjudicator, *id.* § 2.35(a).

The Department may impose civil penalties if it determines that a person violated either statute or an implementing regulation, plus criminal penalties if it finds that

the person did so "knowingly." 7 U.S.C. §§ 7734(a)–(b), 8313(a)–(b). When imposing a civil penalty, the Department determines the amount—up to $500,000 for all non-willful violations adjudicated in a single proceeding brought under either Act, *see id.* §§ 7734(b)(1)(A), 8313(b)(1)(A)(iii)(*I*)— based on a combination of mandatory and discretionary factors. In particular, the Secretary "shall take into account the nature, circumstance, extent, and gravity of the violation" and "may consider" the violator's ability to pay, the effect of a penalty on the violator's ability to continue doing business, the violator's history of violations, the degree of the violator's culpability, and "any other factors the Secretary considers appropriate." *Id.* §§ 7734(b)(2), 8313(b)(2).

## B.

Petitioner Amazon Services LLC operates an online store that sells both Amazon's own products and third parties' products. Third parties source their own products and make their own pricing decisions, but pay a fee to Amazon for the right to offer their products on Amazon's store. Amazon, in turn, processes customer payments and distributes sales proceeds.

Third-party sellers can fulfill orders—that is, deliver products to Amazon customers—themselves or can instead pay an additional fee to use Amazon's fulfillment service, called "Fulfillment by Amazon." A participant in Fulfillment by Amazon registers for the service and then ships its product to an Amazon fulfillment center. Amazon stores the product until it is sold. When a customer purchases a product enrolled in Fulfillment by Amazon, Amazon selects the product from its fulfillment center inventory, packages it, and ships it directly to the customer.

Amazon requires third-party sellers to enter into a business agreement through which they assume responsibility for "comply[ing] with all applicable laws." Amazon Services Business Solutions Agreement, J.A. 252, 264. Amazon's online portal reiterates to sellers: "It is your responsibility to comply with all import and export laws and to ensure the imported goods comply with applicable laws and regulations. You may not import prohibited or restricted products without all required permits and authorizations." *Importing and Exporting Inventory*, Amazon Seller Central (Dec. 26, 2016, 12:15 AM), https://sellercentral.amazon.com/gp/help/ G201468520, J.A. 305. The portal then specifies: "For example, the import of certain agricultural, food products, alcohol, plants and seeds, fish and wildlife products, or medication into certain countries may be prohibited or restricted." *Id.*, J.A. 306. The portal also instructs sellers to "[r]egister as an [importer of record] with customs authorities in the country where you are importing inventory" and explains that "Amazon, including [its] fulfillment centers, will not serve as the [importer of record] for any shipment of [fulfillment service] inventory." *Id.*, J.A. 306.

## C.

In September 2019, the Department's Animal and Plant Health Inspection Service began enforcement proceedings against Amazon for allegedly importing plant and animal products in violation of the PPA and AHPA. The Service based its complaint on multiple instances in which U.S. Customs and Border Protection agents seized packages containing plant and animal products that had been shipped from abroad by participants in Fulfillment by Amazon and addressed to Amazon fulfillment centers in the United States. The facts are undisputed.

First, in March 2015, federal agents at a San Francisco international mail facility seized approximately thirteen packages of beef, pork, and poultry products from China that lacked the importation certificates necessary for those products under the regulations. *See* 9 C.F.R. §§ 94.4, 94.6, 94.9, 94.12. The packages had been shipped by Yummy House Hong Kong, a participant in Amazon's fulfillment service, and were addressed to an Amazon fulfillment center in California.

Second, in July 2015, federal agents at a Los Angeles international mail facility seized three packages containing poultry products from China that similarly lacked the required importation certificates. *See id.* § 94.6. The packages had been shipped by Deng Dan, another participant in Amazon's fulfillment service, and were addressed to another Amazon fulfillment center in California.

Finally, in March 2016, federal agents at a San Francisco international mail facility seized three packages containing kaffir lime leaves from Thailand. As a plant of the subfamily Aurantioideae, kaffir lime leaves were unlawful to import for commercial sale under the regulations then in place. *See* 7 C.F.R. § 319.19(a) (2016). The packages had been shipped by X-Sampa Co., also a participant in Amazon's fulfillment service, and were addressed to an Amazon fulfillment center in Illinois.

The Service's complaint alleged that Amazon had unlawfully imported the products described above in violation of the PPA and AHPA. Complaint ¶¶ 2.1–2.8, 2.17–2.18, J.A. 13–14, 16. The proceeding was assigned to an ALJ, and the parties cross-moved for summary judgment.

The ALJ granted the Service's motion. *In re: Amazon Services LLC*, No. 19-J-0146 (U.S.D.A. May 3, 2021), J.A.

390–439. He concluded that Amazon had unlawfully "import[ed]" the products by aiding, abetting, causing, or inducing their unlawful importation. *Id.* at 24, J.A. 413. The ALJ rejected Amazon's contention that it could not be liable because it was unaware that the third-party sellers had failed to adhere to the statutes and regulations. Emphasizing that the Department has "liberally interpreted" the terms "aid," "abet," "cause," and "induce," he opined that neither "bad intent" nor "any *mens rea* at all" were required to find liability. *Id.* at 28–29, J.A. 417–18. And the ALJ reasoned that Amazon had played an "active" role in the unlawful importations insofar as it "had an ongoing business relationship with the foreign third-party sellers it intended to profit or otherwise benefit from," *id.* at 23–24, J.A. 412–13, and "cho[se] to enter into agreements with foreign sellers to market, sell, and distribute" covered products "into American homes," *id.* at 27, J.A. 416. The ALJ ordered Amazon to pay a $1 million civil penalty: the statutory maximums of $500,000 under the PPA and $500,000 under the AHPA.

Amazon appealed to the Judicial Officer, who affirmed the ALJ's decision. *In re: Amazon Services LLC*, PPA/AHPA Docket No. 19-J-0146, 2022 WL 722724 (U.S.D.A. Feb. 2, 2022). The Judicial Officer concluded that, contrary to Amazon's position, the phrase "aid, abet, cause, or induce" in the PPA and AHPA requires neither substantial assistance nor knowing assistance. *Id.* at *8–14. Based on that interpretation, the Judicial Officer found that Amazon's conduct fell within the scope of the statutes. *Id.* at *14. Alternatively, the Judicial Officer explained that he would reach the same result even on Amazon's reading of the statute because the record showed that Amazon "did substantially assist the importation[s]" and "had knowledge." *Id.*

Amazon filed a timely petition for review in this court. *See* 28 U.S.C. § 2344. We have jurisdiction under the Hobbs Administrative Orders Review Act, *id.* § 2342(2), as supplemented by the PPA, 7 U.S.C. § 7734(b)(4), and AHPA, *id.* § 8313(b)(4)(A).

## II.

Under the Administrative Procedure Act (APA), we review the Department's order to determine whether it is "arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence." *Taylor v. USDA*, 636 F.3d 608, 613 (D.C. Cir. 2011) (citation and internal quotation marks omitted); *see* 5 U.S.C. § 706(2)(A), (E). Amazon argues that the Department's order is not in accordance with law because, contrary to the Department's interpretation, the statutory phrase "aid, abet, cause, or induce" applies only if the conduct in question amounts to knowingly and substantially assisting an unlawful importation. Amazon next contends that the Department lacked substantial evidence for its alternative conclusion that, even on Amazon's reading of the statutes, Amazon's conduct constituted knowing and substantial assistance. We agree with Amazon on both scores.

## A.

## 1.

We first consider what it means to "aid, abet, cause, or induce" an importation of goods in violation of the PPA and AHPA. 7 U.S.C. §§ 7702(9)(B), 8302(12)(B). The statutes do not define the phrase "aid, abet, cause, or induce," or any of its individual terms. But as the Supreme Court recently explained at length in its decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), those terms carry a well-established legal meaning

when used—as they are in the PPA and AHPA—to establish civil liability for aiding and abetting unlawful conduct.

Statutory "terms like 'aids and abets' are familiar to the common law, which has long held aiders-and-abettors secondarily liable for the wrongful acts of others." *Id.* at 484. "We generally presume that such common-law terms 'bring the old soil with them'" when used in statutes. *Id.* at 484–85 (alterations omitted) (quoting *Sekhar v. United States*, 570 U.S. 729, 733 (2013)).

What is the content of that "old soil" when it comes to aiding-and-abetting liability? The Supreme Court in *Twitter* identified a "conceptual core that has animated aiding-and-abetting law for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Id.* at 493 (alteration in original) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)). And while "[a]iding and abetting is an ancient criminal law doctrine," *id.* at 488 (alteration in original) (quoting *Cent. Bank of Denver, N. A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994)), the understanding of its scope in the criminal law "has substantially influenced its analog in tort," *id.* As a result, when the "phrase 'aids and abets'" is used in a statute imposing civil liability, it "refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* at 493.

The relevant phrase in the PPA and AHPA—"aid, abet, cause, or induce"—contains the words "cause" and "induce" in addition to "aid" and "abet." 7 U.S.C. §§ 7702(9)(B), 8302(12)(B). The inclusion of "cause" and "induce" in that phrase does not expand the scope of secondary liability beyond the traditional core of aiding-and-abetting liability. In fact, "cause" and "induce" are among "[t]he most common" verbs used to impose aiding-and-abetting liability. *See* 2 Wayne R.

LaFave, Substantive Criminal Law § 13.2(a) (3d ed. 2023). It is true that the words "cause" and "induce," if construed in isolation, could range beyond "conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 493. After all, one can causally contribute to wrongdoing without consciously and culpably participating in it—think, for instance, of a cab driver who unknowingly gives a thief a ride to the store he aims to rob. "But we read statutory terms in context, not in isolation." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1298 (D.C. Cir. 2023). So when the words "cause" and "induce" appear in a phrase like "aid, abet, cause, or induce," we interpret "cause" and "induce" consistently with their neighbors "aid" and "abet" and with the "point of aiding and abetting"—"to impose liability on those who consciously and culpably participated in the tort at issue." *Twitter*, 598 U.S. at 506; *see Woodhull*, 72 F.4th at 1298–99.

That understanding reflects that "courts have long recognized the need to cabin aiding-and-abetting liability to cases of truly culpable conduct." *Twitter*, 598 U.S. at 489. If "aiding-and-abetting liability were taken too far," the Supreme Court cautioned in *Twitter*, "then ordinary merchants could become liable for any misuse of their goods and services, no matter how attenuated their relationship with the wrongdoer." *Id.* Or "those who merely deliver mail or transmit emails could be liable for the tortious messages contained therein." *Id.* Or "mostly passive actors like banks" could "become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491. To avoid those kinds of outcomes, the Supreme Court emphasized, courts have long sought "to ensure that liability fell only on those who had abetted the underlying tort through conscious, culpable conduct." *Id.* at 492 (internal quotation marks omitted).

11

2.

In defending the imposition of liability against Amazon in this case, the Department construes "aid, abet, cause, or induce" in the PPA and AHPA in a manner incompatible with the understanding of aiding-and-abetting liability recognized by the Supreme Court in *Twitter*. According to the Department, the PPA and AHPA allow for imposing aiding-and-abetting liability on a strict-liability basis, without any need to show knowledge of the primary violator's wrongdoing. But one cannot "consciously and culpably" participate "in another's wrongdoing," *id.* at 493, if one is not "conscious" of—does not know of—the wrongdoing in the first place. So for the Department's interpretation of aiding-and-abetting liability to prevail, the Department must show that the PPA and AHPA are exceptions to the general understanding that the "phrase 'aids and abets' in [a statute] refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* The Department's effort to do so is unpersuasive.

a.

The Department chiefly relies on our court's decision in *Federal Express Corp. v. U.S. Department of Commerce*, 39 F.4th 756 (D.C. Cir. 2022). There, we considered an argument that a "statute's civil aiding and abetting prohibition plainly requires a culpable mind." *Id.* at 767. The challenge contended that an agency's imposition of aiding-and-abetting liability on a strict-liability basis was *ultra vires*—i.e., foreclosed by the statute. We rejected the challenge. *See id.* at 767–72. The Department argues that, if an agency's strict-liability understanding of civil aiding-and-abetting liability was permissible in *Federal Express*, it should be permissible here as well. We disagree.

As an initial matter, because the challenge in *Federal Express* was an *ultra vires* claim, we applied an especially "exacting standard . . . confined to 'extreme' agency error." *Id.* at 764. "An *ultra vires* challenge, in other words," we explained, "is essentially a Hail Mary pass." *Id.* at 765 (alteration and internal quotation marks omitted). So even if the agency's strict-liability interpretation of aiding-and-abetting liability in *Federal Express* was not "the type of blatant error necessary for an *ultra vires* challenge to succeed," *id.* at 767, there is no need for Amazon to satisfy that kind of "Hail Mary" standard here. Amazon, that is, need not "show more than the type of routine error in statutory interpretation" that suffices under normal APA review. *Id.* at 765 (internal quotations marks omitted).

Not only did this court in *Federal Express* sustain the agency's strict-liability understanding under a markedly more agency-forgiving form of review, but the *Federal Express* court also considered the question before the Supreme Court issued its decision in *Twitter*. Whereas the *Federal Express* court had perceived a measure of uncertainty on whether the common law of civil aiding-and-abetting liability "requires a culpable mind," *id.* at 767; *see id.* at 770–71, the Supreme Court in *Twitter* later identified a "conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably participated in a wrongful act." 598 U.S. at 493 (alteration and internal quotation marks omitted).

Also, *Federal Express* must be situated in the statutory context it evaluated. The statutes involved here—the PPA and AHPA—do not implicate national security and foreign policy in the same central way as the 2018 Export Controls Act, the statute at issue in *Federal Express*: that law specifically

restricts exports that contribute to the military potential of foreign countries. *See* 39 F.4th at 759–61. This court in *Federal Express* concluded that "rotely imposing common-law principles" was "especially inapt for a statute so deeply tied to foreign policy and national security." *Id.* at 771.

For all those reasons, *Federal Express* does not stand in the way of adhering to *Twitter*'s prescription that the "phrase 'aids and abets'" as used in the PPA and AHPA "refers to a conscious, voluntary, and culpable participation in another's wrongdoing." 598 U.S. at 493.

b.

The Department next relies on the statutory structure of the PPA and AHPA. The Department emphasizes that those statutes authorize criminal penalties only for a "person that knowingly" violates their prohibitions, 7 U.S.C. §§ 7734(a)(1)(A), 8313(a)(1)(A), but allow for civil liability without the same explicit condition that a violation be knowing, *id.* §§ 7734(b)(1), 8313(b)(1). The express "knowingly" condition for criminal penalties and the absence of any such express condition for civil penalties, to the Department, means it can exact civil penalties on a strict-liability basis. That understanding is fortified, according to the Department, by the statutes' grant of discretion to consider (or not) a violator's "degree of culpability" in setting the amount of a civil penalty. *Id.* §§ 7734(b)(2), 8313(b)(2). That allowance, the Department believes, reinforces its authority to impose civil penalties without any level of culpability.

The Department's structural argument is unavailing. Even assuming the presence of a "knowingly" condition for criminal penalties and the absence of that condition for civil penalties implies that civil penalties can be imposed on a strict-liability

basis, that understanding may be true for *primary* violations without necessarily also being true for *secondary*—i.e., aiding-and-abetting—violations.  The Department, that is, may be able to impose civil penalties on primary violators, such as those who themselves carry goods into the United States, on a strict-liability basis.  Indeed, Amazon concedes as much.  But that does not mean that someone who secondarily assists such a primary violator can likewise be subject to civil penalties regardless of a culpable state of mind.  Rather, secondary aiding-and-abetting liability, per the Supreme Court's decision in *Twitter*, requires culpable, conscious participation in wrongdoing.  598 U.S. at 493.  And that remains true even if the structure of the statute means that *some* violators—primary violators—can be subject to civil penalties on a strict-liability theory.

c.

The Department seeks to distinguish *Twitter* based on certain text contained in the statute involved in that case. *Twitter* construed the Justice Against Sponsors of Terrorism Act (JASTA), which imposes civil liability on "any person who aids and abets, by knowingly providing substantial assistance," an act of international terrorism.  18 U.S.C. § 2333(d)(2).  And "Congress provided additional context by pointing to *Halberstam v. Welch*, 705 F.2d 472 (CADC 1983), as 'provid[ing] the proper legal framework' for 'civil aiding and abetting . . . liability.'" *Twitter*, 598 U.S. at 485 (first alteration in original) (quoting JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. 852, 852 (2016)).  Our court's decision in *Halberstam* concluded that, for civil aiding-and-abetting liability to attach, the aider-abettor must have "knowingly and substantially assist[ed] the principal violation."  705 F.2d at 477.  Congress in JASTA thus not only pointed specifically to our decision in *Halberstam*, but it also included in JASTA's aiding-and-

abetting provision the phrase "by knowingly providing substantial assistance," the standard set out in *Halberstam*. 18 U.S.C. § 2333(d)(2).

While the statutes in this case, the PPA and AHPA, do not contain that additional text, the settled understanding of aiding-and-abetting liability set forth in *Twitter* still controls. *Twitter* turned centrally on the longstanding meaning of the statutory phrase "aids and abets," *id.* § 2333(d)(2), not on the "additional context" provided in JASTA by the reference to *Halberstam* and the inclusion of text echoing *Halberstam*'s standard, 598 U.S. at 485. That is why the decision in *Twitter* emphasized the "conceptual core that has animated aiding-and-abetting liability for centuries." *Id.* at 493.

*Twitter* accordingly sets forth a general rule about the use of the phrase "aids and abets" in a statute, one untethered to the additional text included in JASTA: "The phrase 'aids and abets' in [JASTA], *as elsewhere*, refers to a conscious, voluntary, and culpable participation in another's wrongdoing." *Id.* (emphasis added). "Elsewhere" includes the PPA and AHPA, and the words "aid" and "abet" in those statutes thus carry the same meaning as in JASTA. The upshot is that a person "aids, abets, causes, or induces" an unlawful importation under the PPA and AHPA only if she consciously and culpably participates in the importation.

d.

In its final argument for its strict-liability interpretation of aiding-and-abetting liability under the PPA and AHPA, the Department makes an appeal for deference under the *Chevron* framework. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The Supreme Court, however, recently overruled *Chevron*, holding that "courts

need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  That holding governs here and precludes us from deferring to the Department's interpretation under the now-overruled *Chevron* framework.

B.

Having concluded that, contrary to the Department's interpretation, a person aids, abets, causes, or induces an unlawful importation under the PPA and AHPA only if she consciously and culpably participates in it, we next consider whether we can sustain the Department's order based on its alternate conclusion that Amazon knowingly and substantially assisted the unlawful importations at issue here.  *See In re: Amazon*, 2022 WL 722724, at \*14.  We cannot.  The record does not contain substantial evidence from which a reasonable factfinder could conclude that Amazon consciously and culpably participated in the unlawful importations.

To start, recall the ways in which Amazon assisted Yummy House, Deng Dan, and X-Sampa, the overseas sellers who shipped the covered plant and animal products in violation of the PPA and AHPA.  Those sellers participated in Amazon's fulfillment service, a routine business service offered to all third-party sellers.  Through that service, Amazon agreed to store the sellers' products in its fulfillment centers until the products were sold and then to package and ship the products to customers upon a sale.  Amazon allegedly knew that Yummy House, Deng Dan, and X-Sampa would ship plant and animal products to the fulfillment centers because the sellers registered those products with the fulfillment service.  Amazon also knew about the regulations restricting the importation of plant and

animal products, as demonstrated by the information Amazon provides in its online portal for sellers.

None of those facts support a finding that Amazon consciously and culpably participated in the sellers' unlawful importations. There is no indication that Amazon was aware of the violations. Indeed, the "only affirmative conduct" undertaken by Amazon was offering and operating its fulfillment service. *See Twitter*, 598 U.S. at 498 (internal quotation marks omitted). Nothing in the record suggests that Amazon gave Yummy House, Deng Dan, or X-Sampa "any special treatment or words of encouragement" or "took any action at all" with respect to the unlawful acts. *Id.* The facts establish only that third-party actors used Amazon's fulfillment service to import products in violation of the PPA and AHPA. The mere operation of a neutral fulfillment service that makes it easier for third-party sellers to import products into the United States—and even to do so unlawfully—is not conscious and culpable involvement in the wrongdoing.

The Supreme Court's analysis in *Twitter* is highly instructive. The defendants there operated social-media platforms used by a terrorist organization in furtherance of its perpetration of unlawful acts. The Court allowed "that bad actors" may be "able to use platforms like defendants' for illegal—and sometimes terrible—ends." *Id.* at 499. But that did not justify treating the defendants as aiders and abettors. After all, "the same could be said of cell phones, email, or the internet," yet the Court "generally [did] not think that internet or cell service providers incur culpability merely for providing their services to the public" or that "such providers would normally be described as aiding and abetting, for example, illegal drug deals brokered over cell phones—even if the provider's conference-call or video-call features made the sale easier." *Id.*

18

The Court emphasized the error in "focusing . . . primarily on the value of defendants' platforms *to*" the terrorist organization, "rather than whether defendants culpably associated themselves with [the organization's] actions." *Id.* at 504. And the Court attached significant "weight to defendants' arm's-length relationship with" the organization—"which was essentially no different from their relationship with their . . . other users—and their undisputed lack of intent to support" the wrongdoing. *Id.* It thus was not enough "that defendants supplied generally available virtual platforms that [the organization] made use of, and that defendants failed to stop [the organization] despite knowing that [it was] using those platforms." *Id.* at 505.

Here, then, it is not enough for the Department to show that Amazon supplies a generally available fulfillment service that may be of substantial value to third-party sellers, and that Amazon knew about the use of the service by Yummy House, Deng Dan, and X-Sampa, to sell their products to American consumers. Amazon did not purport to involve itself more closely with the commercial activity of those sellers than with that of "other users" of its fulfillment service. *Id.* at 504. Nor did the Department provide evidence that Amazon had an "intent to support" those sellers' unlawful practices. *Id.* The Department's finding of liability "rests less on affirmative misconduct and more on an alleged failure" to stop Yummy House, Deng Dan, and X-Sample from using Amazon's infrastructure in importing products unlawfully. *Id*. at 499– 500. Such "passive nonfeasance" does not amount to conscious and culpable participation in the circumstances. *Id*. at 500.

The "fundamental question of aiding-and-abetting liability," the Supreme Court summarized, is: "Did defendants

consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?"  The answer in *Twitter* was no.  The answer here is the same.

\*   \*   \*   \*   \*

For the foregoing reasons, we grant the petition for review, vacate the Department's order, and remand to the agency for further proceedings consistent with this opinion.

*So ordered.*